Donald **BRYSON**, Martin Eizik and Mark Berkowitz, Plaintiffs,

v.

The **BANK OF NEW YORK** and Empire National Bank, Defendants.

No. 81 Civ. 3202–CSH.

United States District Court, S.D. New York.

Feb. 24, 1984.

Daniel L. Kurz, Monsey, N.Y., for plaintiffs.

Emmet, Marvin & Martin, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendant Empire National Bank, which was merged into defendant Bank of New York in September, 1980, issued "Visa" credit cards to each of the plaintiffs at undisclosed dates prior to 1980. Sometime thereafter, apparently on the occasion of the denial of a home improvement loan by Empire National (hereinafter referred to collectively with Bank of New York as "the Bank") to plaintiff Berkowitz, plaintiffs filed this action. The complaint alleges that plaintiffs are the victims of numerous violations by defendants of federal and state truth-in-lending laws in connection with the "Visa" accounts and the loan. It requests various statutory, actual and punitive damages as well as costs and attorneys' fees. Defendants have moved to dismiss all claims and, alternatively, for summary judgment on Counts I and II of the complaint which allege, respectively, that the defendants violated various provisions of the federal Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* ("the Act") in connection with the "Visa" accounts and that defendants violated other provisions of the Act in connection with a home improvement loan denied plaintiff Berkowitz. Defendants also move for a more definite statement regarding Counts I, III, and IV. The latter two counts allege, respectively, that the denial of the home improvement loan to Berkowitz violated the Equal Credit Opportunity Act, specifically 15 U.S.C. § 1691(a), and that all of the above acts violated New York state law.

### I.

Plaintiffs each held individual credit card accounts with the Bank which permitted them to make purchases or to obtain cash advances from the Bank on credit. As required by the Federal Truth-in-Lending Act, each month the Bank sent them billing statements setting out, *inter alia*, the amount of the purchases and cash advances charged to their accounts that month, the total balances outstanding in the accounts, and any "finance charges" levied on the balances. The plaintiffs claim that these monthly billing statements vio-

lated the Act [1] in the four following ways: 1) in violation of 15 U.S.C. § 1637(b)(8) (1980), the monthly billing statement failed to disclose that the balance on which the finance charge was imposed was computed "without first deducting all credits during the period"; 2) in violation of § 1637(b)(8), the Bank's Visa monthly billing statement (a sample of which is attached as Appendix A) failed to supply a clear and conspicuous statement [2] explaining how the balance on which the Bank imposed its monthly finance charge was computed; 3) in violation of § 1637(b)(10) and 12 C.F.R. § 226.7(c) (1980), the monthly billing statement failed to provide on its face a clear and conspicuous statement of the date by which payment had to be made in order to avoid the imposition of a finance charge on the outstanding balance; and 4) in violation of 12 C.F.R. § 226.7(b)(1)(ix) (1980) the monthly statement failed to clearly and conspicuously accompany a statement of the outstanding balance in the account on the closing date of the billing cycle with a statement of the date on which payment had to be made in order to avoid the imposition of additional finance charges on that balance.

Plaintiff Berkowitz also claims individually that the Bank violated 12 C.F.R. § 226.4(a)(5) (1980) by failing to include in the finance charge assessed on a home improvement loan for which he applied a charge for credit life insurance. He claims that acceptance of such insurance was required for approval of the loan and that his dickering with the Bank over this alleged requirement caused the Bank to refuse his loan application. The plaintiffs also append the customary parallel claims under New York state law, which forbids "[d]eceptive acts or practices in the conduct of any business." N.Y.Gen.Bus.Law § 349(a) (McKinney's Supp.1983).

In support of the instant motion the Bank asserts 1) that its monthly billing statements were in full compliance with the Act; 2) that plaintiff Bryson, who filed for bankruptcy before filing this suit, is not a proper party; 3) that plaintiff Berkowitz lacks standing to assert his claims in connection with the bank loan because the loan transaction was never "consummated"; 4) that the loan documents complied with the Act's disclosure requirements; and 5) that because its practices do not violate federal law, they do not violate New York state law.

II.

Like all "Visa" cardholders, plaintiffs could use their cards to purchase goods and receive cash advances for which they would be billed later on a monthly basis. Each month they received billing statements which summarized their purchases and cash advances since the last billing date and added these amounts to any previously outstanding balance in their accounts. If they paid this total amount within fifteen to twenty days after receiving their bills, they would not be charged for the cost of extending them this credit. If, however, they paid only a part or none of this total, the Bank would levy a finance charge at the end of their next billing cycle.

The finance charge was calculated as a percentage of the amount of credit extended. It was not, however, levied on the "total balance." Instead, it was levied on a figure referred to by the Bank as "the average daily balance." In order to calculate the average daily balance, the Bank figured for each day of a given billing period a current account balance by adding to the prior day's balance all cash advances and purchases recorded during the current day and then subtracting all credits and payments recorded this day. At the end of

---

**1.** The Truth-in-Lending Act was amended substantially in 1980, and the implementing regulations of the Federal Reserve Board, known as Regulation Z, have since been changed in compliance with these revisions. Because all alleged violations occurred before the 1982 effective date of the revisions, the pre-1981 statute

and regulations will be applied. *See Gambardella v. G. Fox & Co.,* 716 F.2d 104, 107 (2d Cir.1983).

**2.** All disclosures required by TILA must be made "clearly and conspicuously." 15 U.S.C. § 1631(a) (1980).

the month the Bank summed up these daily current balances. It then divided this sum by the number of days in the month to arrive at the average daily balance. It was this balance which was multiplied times the fractional interest rates to calculate the finance charge for the month. Two interest rates applied. As appears from Appendix A, an annual percentage rate of 18 percent applied to the "average daily purchase balance of $500 or less," and a 12 percent rate "on any excess thereof over $500 and on the average daily advance balance."

Under § 1637(b)(8), if the balance on which the finance charge was imposed was computed "without first deducting all credits during the period," the Bank was required to disclose this fact. The statement did not make such a disclosure because, the Bank argues, the average daily balance was not so calculated. Plaintiff claims that it was. The dispute centers on what Congress meant by the phrase "first deducting all credits during the period."

The plaintiffs' theory is that § 1637 requires disclosure unless *no* balance is arrived at until all credits which have accrued during the month are subtracted. An example will be more helpful than further explanation in illustrating this. Assume an account with a balance of $1000 at the beginning of the month, a $1000 credit accruing on the last day of the month, and a billing period running from the first to the last day of the month. Plaintiffs argue that § 1637 envisions disclosure unless such a state of facts results in a finance charge balance of zero—i.e., the $1000 initial balance minus the "credit during the period" of $1000. By contrast, under the Bank's system, as plaintiffs point out, a balance of approximately $966 would result (assuming a thirty-day month)—i.e., twenty-nine "daily balances" of $1000 and one "daily balance" of zero all summed and then divided by thirty. Plaintiffs, in other words, argue that the Bank is required to make a disclosure unless no balance is struck until all credits which have accrued

during the period are first deducted from the previous month's balance.

The Bank, on the other hand, contends that because it subtracts all credits at some time during the month, it does first deduct all credits. That is, its position is that the statute does not require disclosure unless credits accrue during the month and are not deducted at all during that month's balance calculations.

Plaintiffs derive some comfort from the bald words of the statute. The statute speaks only of one "balance," not of several balances. A logical reading is that this "balance" refers to the final balance on which the finance charge is ultimately imposed. If, in our example above, twenty-nine of the thirty "average daily balances" are calculated without first deducting the $1000 credit which was made during the period, it is less than precise to say that the final balance which is based on them is determined after first deducting all credits during the period. In fact, only one-thirtieth of the final balance was determined after the called-for deduction.

Nevertheless, a reading of the statute's history convinces me that such a literal reading would misconstrue the statute. The brief legislative history of the bill contains this statement of the intended purpose of § 1637(b)(8):

"Section 203(d)(3)(F) [3]—*Balance on which finance charge is computed.*—The method of determining the balance on which the finance charge is computed must be disclosed, and *plans using the opening-balance method must disclose that fact* as well as the amount of payments during the period." (second emphasis added).

1968 U.S.Code Cong. and Admin.News 1962, 1984.

In the "opening balance," or "previous balance," method of computing finance charges, interest is based on the previous month's balance due, regardless of charges or credits to the account during the billing period. *Turoff v. May Co.*, 531 F.2d 1357,

---

**3.** The bill was renumbered before codification.

1359 (6th Cir.1976). "Under the previous balance method, the finance charge is imposed on *all* of the previous balance unless *all* of it has been paid in the following month." *Taylor v. R.H. Macy & Co.*, 481 F.2d 178, 179 (9th Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973).[4]

This legislative history suggests that § 1637(b)(8) was aimed solely at the previous balance method. That impression is consistent with the language of the section. Because under the previous balance method the credits during the period have no influence on the balance on which the finance charge is imposed, the balance determined by this method is certainly one "determined without first deducting all credits during the period." The desirability of explicit disclosure of the use of this method is evident, for under the previous balance method a cardholder can be charged for a full month's interest on a balance despite his or her paying much of it off during the month. The lender thus levies its finance charge on funds it is no longer lending. It is for this reason that the previous balance method has been characterized as "a devious means for taking unfair advantage of a customer relationship by working to squeeze every possible penny out of the finance charge." *Haas v. Pittsburgh National Bank*, 381 F.Supp. 801, 809 (W.D. Pa.1974), *aff'd in part, rev'd in part,* 526 F.2d 1083 (3d Cir.1975). *See further,* FTC Consumer Policy Statement No. 4, *The Previous Balance Method* (May 7, 1970), Consumer Credit Guide (CCH) ¶ 30,369, 1969–1974 Special Releases-Correspondence Transfer Binder.

By comparison, the average daily balance method is a more favorable method for the cardholder of calculating the finance charge. Cardholders are charged for credit only during the time it is actually extended to them. Once they pay off some portion of their debt, they cease being charged for it. Express disclosure of the use of this method (beyond the explanation of its mechanics which is required by the first sentence of § 1637(b)(8)) would serve little purpose. The average daily balance method is not so unfair, unusual, or contrary to natural expectations that its use must be specially called to the consumer's attention. The method suggested by plaintiffs as the norm is in turn rather unfavorable to the creditor. Debtors escape finance charges altogether on credit extended to them so long as they pay up before the month ends. Such a system makes the requirement of payment within 15 to 20 days after billing entirely redundant. In fact, plaintiffs cite no creditors who actually use the system.

In conclusion, I find that while the language of the second sentence of 15 U.S.C. § 1637(b)(8) (1980) can be construed to require

---

**4.** The Third Circuit has illustrated the previous-balance method this way:

"The manner in which the previous balance method operates is most effectively described by example. Assume that a cardholder's billing date is the thirtieth of each month and that on March 30 the balance in the cardholder's account is zero. If the cardholder purchases $100 worth of merchandise on April 25, that purchase will appear on the cardholder's April 30 statement but will not be included in the balance on which the service charge for the month of April is calculated. The April service charge will be one and one-quarter percent of zero, [assuming a finance charge of 1¼%] or zero. The five days' use of the $100 is called the 'free ride' since no service charge is imposed. If the purchase had been made on April 5, the 'free ride' would have been for 25 days.

"In the example, the balance outstanding on April 30 is $100. This balance is also the balance on the first day of the May billing cycle and, therefore, is the balance on which the May service charge will be imposed unless the balance is fully discharged before the end of the May billing cycle. Thus, if the cardholder pays $75 on account on May 5 and no other transactions occur during May, the service charge for the May billing cycle will be one and one-quarter percent of $100, the previous balance, or $1.25. The service charge for May is computed in this manner even though $100 was outstanding during only five days and the cardholder had the use of only $25 during the rest of the May billing cycle. The actual rate of service charge for May thus is much higher than the nominal rate of one and one-quarter percent specified in the contract."

*Haas v. Pittsburgh National Bank,* 526 F.2d 1083, 1090 (3d Cir.1975).

disclosure of defendant's practices, the language was in fact targeted at a very specific lending practice in which the Bank does not indulge. The language "without first deducting all credits during the period," when viewed in the context of the statute's history and modern lending practices, is intended to refer only to those practices in which the final balance on which the finance charge is imposed takes *no* account of some or all credits which accrued during the billing period. Because this sentence of § 1637(b)(8) was not intended to reach the average daily balance method of finance charge calculation, defendant was not required to make any disclosures under it.

### III.

■ Under 15 U.S.C. § 1637(b)(8) (1980), the Bank's monthly statement was required to state clearly and conspicuously "the balance on which the finance charge was computed and ... how the balance was determined."[5] The method used by the Bank, the average daily balance method, is described above. In essence, the Bank calculates the balance in the cardholder's account at the end of every day and then averages these over the course of each billing period to arrive at a final monthly average balance on which a finance charge is imposed.

The Bank's billing statement describes this process thus:

"The Average Daily Balance of Purchases and Advances subject to FINANCE CHARGE is determined by adding together the daily balances outstanding of

each respectively during the period from the previous billing date to the date of the next month's billing statement and dividing the result of both balances by the number of days in the billing period."

Paragraph 8, Defendant's Exhibit C attached to defendant's Notice of Motion.

In evaluating the Bank's compliance with the "clearly, conspicuously, in meaningful sequence" disclosure requirement of the Act, 12 C.F.R. § 226.6(a) (1980), it must be remembered that the Bank's disclosure need not be so clear that it cannot be improved upon. *Dixon v. D.H. Holmes Co.*, 566 F.2d 571, 572–573 (5th Cir.1978). The Act "does not require perfect disclosure, but only disclosure which clearly reveals to consumers the cost of credit." *Gambardella v. G. Fox & Co.*, 716 F.2d 104, 118 (2d Cir.1983) (citing *Dixon*). The Bank's statement is not a model of clarity, but a careful reading of it reveals that it does describe the process followed by the Bank in arriving at the average daily balance.[6] Further, it should be noted that the mere statement that the "average daily balance" method is used, without explanation of the mechanics of the method, has been held disclosure sufficient to comply with § 1637(b)(8). In other words, the phrase is self-explanatory. *Rothenberg v. Chemical Bank New York Trust Co.*, 400 F.Supp. 1299, 1304 (S.D.N.Y.1975) (Duffy, J.); *see also*, FRB Public Information Letter No. 220 (December 31, 1969), Consumer Credit Guide (CCH) ¶ 30,543, 1969–1974 Special Releases-Correspondence Transfer Binder. Reliance cannot be placed wholly

---

**5.** A similar disclosure must be made before extension of credit under 15 U.S.C. § 1637(a)(2) (1980). Since defendant's disclosure was similar in both circumstances, with the monthly disclosure the less clear of the two, the monthly disclosure analysis will serve for both.

**6.** The model of clarity for this type of disclosure is to be found in the FRB Balance Computation Methods Model Clause, 12 C.F.R. § 226.29, Appendix G–4 (1983), 1 Consumer Credit Guide (CCH) ¶ 3501 (1983), which reads:

"(d) Average daily balance method (including current transactions)

"We figure [a portion of] the finance charge on your account by applying the periodic rate

to the 'average daily balance' of your account (including current transactions). To get the 'average daily balance' we take the beginning balance of your account each day, add any new [purchases/advances/loans], and subtract any payments or credits, [and unpaid finance charges]. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'average daily balance.'"

Defendants did not have the benefit of this recently-written model when they printed their forms.

on this holding, however. If the Bank undertakes to explain it must do so clearly.

■ Plaintiffs urge two ways in which the statement is unclear. First, they claim that it is not clear "when the Purchase balance and the Advances balance are added together to make one figure, and when they are treated as separate balances." Plaintiffs' Memorandum, p. 20. In order to explain plaintiffs' point it is necessary to review the Bank's practices. The cards held by plaintiffs could be used not only for charging purchases but for getting cash advances. On the monthly statement these are listed separately in two columns. Only in one separate box, under the heading "Total New Balance As Of Billing Date," are they summed. Plaintiffs' point is that it is not clear at which point in the calculation process they are summed. The Bank answers that the balances are always calculated separately. Only at the end are they summed. There is no mention in the explanation of adding the balances during the calculation of a finance charge because it is not done.

Plaintiffs' argument is frivolous. It attempts to create a confusion where none exists. The Bank is not required to disclose the negative—that it does not sum the balances during calculation of the finance charge.[7] Further, by separating the two balances so thoroughly on the statement the Bank avoids any possibility of confusion.

Plaintiffs make a more cogent argument that use of the phrase "date of the *next month's* billing statement" is somewhat ambiguous. They argue that "next month" can be taken to refer to the month following the current month, although that is not the intended meaning. The realistic risk of confusion, however, is negligible. Since "next" month follows "previous" month in the disclosure statement, it most sensibly refers to the billing date following the "previous" billing date, i.e., the "next" billing date. Further, plaintiffs' interpretation is nonsensical when viewed in light of the clearly-labelled purpose of the calculations: to arrive at an *average* balance. Dividing the sum of outstanding balances by sixty days would result in only half of the average daily balance. In sum, I find that the label "average daily balance" combined with the description in paragraph 8 clearly revealed the manner in which the balance was calculated. The label effectively cancelled out any potential ambiguity in the description.

## IV.

■ The plaintiffs' final two claims are best considered together. Understanding them requires a further examination of the Bank's billing practices. The claims discussed heretofore focused on the calculation of the balance on which the finance charge, the Bank's source of revenue from cardholders, is imposed. As mentioned above, however, the Bank grants cardholders a grace period. If payment of the outstanding balance is made within this period, no finance charge is imposed. In effect, the cardholder is given free credit so long as he or she pays up within several days of receiving his or her bill. Plainly such a practice has a significant effect on the cost of credit to the consumer. A consumer who regularly pays his balance within the grace period can obtain month-long grants of credit at no cost, while those consumers who do not meet the deadline pay the full cost. Recognizing this, Congress included in the Act a provision which requires disclosure of the time within which payment must be made and the amount which must be paid to avoid a finance charge. 15 U.S.C. § 1637(b)(10) (1980). The interpretive regulations promulgated by the Federal Reserve Board under this provision require the monthly statement to set forth on its face "[t]he closing date of the billing cycle and the outstanding balance in the account on that date ... accompanied by the statement of the date by which ..., payment must be made to avoid additional finance charges."

---

7. Practically it makes no difference. The total balance would be the same regardless of whether the separate balances were summed before or after the calculation of a finance charge.

12 C.F.R. §§ 226.7(b)(1)(ix) (1980) and 226.-7(c) (1980).

Both dates referred to in the regulation and the outstanding balance were listed on the face of the Bank's statements. The "billing date" and the "payment date" appear in boxes bearing those captions. The balance was printed in a box in the lower right of the statement entitled, in small but just legible print, "Total New Balance as of Billing Date." Basing their claims primarily on an interpretive letter and two sample forms published by the Federal Reserve Board, however, plaintiffs assert that this disclosure is not clear enough to satisfy the regulations.

Plaintiffs cite two model forms for monthly statements and three interpretive letters published by the Federal Reserve Board. The first interpretive statement, FRB Public Information Letter No. 393, (June 6, 1970), Consumer Credit Guide (CCH) ¶ 30,036, 1969–1974 Special Releases-Correspondence Transfer Binder, attempts to explain the meaning of "accompanied by" in § 226.7(b)(1)(ix). Although the letter is somewhat cryptic, it appears to read "accompanied by" to require that the date by which payment must be made and the relevant balance be connected in some manner, presumably to clarify exactly how much the consumer must pay to avoid the finance charge. Although the two model forms, published during the relevant time at 1 Consumer Credit Guide (CCH) ¶ 3851 and ¶ 3852 but now unavailable, connect the date and the balance by an arrow, the letter states that the arrow is not necessary so long as the creditor follows "a format of 'close connection' by physical proximity." The letter further describes as a "required narrative statement" the statement that payment by the payment due date will avoid a finance charge. The other two letters relied on by plaintiffs simply emphasize that creditors which include on their statements a required minimum monthly payment must take care not to confuse the consumer into thinking that payment of the minimum payment, rather than of the full balance, avoids the finance charge. FRB Public Information Letter

No. 436 (February 1, 1971), Consumer Credit Guide (CCH) ¶ 30,630, 1969–1974 Special Releases-Correspondence Transfer Binder; FRB Public Information Letter No. 538 (July 21, 1971), Consumer Credit Guide (CCH) ¶ 30,752, 1969–1974 Special Releases-Correspondence Transfer Binder.

Defendant urges that these administrative letters should count for little because they represent only the informed view of an individual bureaucrat. However, the Supreme Court, in citing several Public Information Letters, has taken a different attitude toward Federal Reserve Board interpretations of the Act's regulations. Because of the important role of the Federal Reserve in implementing the statutory scheme, the broad power delegated to it, and indications of a Congressional desire to make Federal Reserve interpretations authoritative, the Court has ruled that the "traditional acquiescence in administrative expertise is particularly apt under · [the Act]." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 566–568, 100 S.Ct. 790, 797, 797–798, 63 L.Ed.2d 22 (1980). Federal Reserve interpretations are to be accepted as dispositive "[u]nless demonstrably irrational." *Id.* at 565, 100 S.Ct. at 796.

The implications of the above-cited interpretive letters are clear. First, No. 393 describes as "required" the narrative statement that payment of the full balance by the payment due date will avoid a finance charge. Because subsection (ix) of 12 C.F.R. § 226.7(b)(1) is not explicitly excepted from the requirement of disclosure on the face of the statement by 12 C.F.R. § 226.7(c), this narrative must appear on the front of the statement. The Bank's statement, as noted above, included only the cryptic label "payment date." The further information which is required in the narrative was contained in the small print on the back. It was not on the statement's face. The Bank's monthly statement thus was not in compliance with the regulations.

The Bank argues that under the statute and regulations the narrative need not be

disclosed on the face of the document so long as the date is disclosed and is clearly labelled. This is, of course, a tenable interpretation of the Act, since 15 U.S.C. § 1637(b)(10) does not state exactly what language must be used on the statement.[8] In the face of the administrative letter the argument, however, is unavailing. The administrative ruling governs unless it is irrational. By no stretch of the imagination is this ruling irrational. The Act requires meaningful disclosure. There is no better way to accomplish meaningful disclosure than to require creditors to state clearly and succinctly the financial implications of the payment due date on the face of their statements. In this manner all consumers are far more immediately and fully informed of their ability to avoid entirely the finance charge than by the mere label "payment date." Because defendant has failed to comply with a rational administrative interpretation of the Act, it must be found in violation.

Defendants also have made no attempt to connect the balance and the payment due date as required by letter No. 393. The two are located relatively far apart on the statement, and no lines or other printing connect them. Defendants argue that the label "Total New Balance As Of Billing Date" makes clear the implications of the balance, thus serving the same purpose as physical connection.[9] Again, however, this argument misses the point. Letter No. 393 requires " 'close connection' by physical proximity." While it is true that "accompanied by" can be read more loosely to require only simultaneous presence of the balance and date, it is not irrational to read it as requiring a closer connection. Such a connection serves the purpose of this section of the Act by making clear to borrowers exactly what the numbers on their bills mean. The most important consideration to many cardholders is avoiding the finance charge. Connecting the balance and the payment date permits them to ascertain at a glance all that they need to know to avoid the charge. It further lowers the risk of confusing the minimum required payment and the total balance.

The letter's interpretation of the regulations is rational. The Bank's statement, by failing to make any physical connection, by proximity or otherwise, between the payment due date and the total balance was in violation of letter No. 393 and thus of the Act.

### V.

The Bank contends that plaintiff Bryson, who sues on the above Truth-in-Lending Act claims, is not a proper party to the suit. It is undisputed that Bryson filed a petition of personal bankruptcy in March, 1981, prior to the institution of this lawsuit. Defendant points out that this filing vested title to Bryson's estate in the trustee in bankruptcy. Because all rights of action the bankrupt may have are included in the estate, defendant argues that the trustee was the only proper party to bring suit. Plaintiff Bryson responds by submitting an affidavit by the trustee, dated several months after the filing of the lawsuit, in which the trustee purports to abandon this cause of action on behalf of the estate. Plaintiff claims that this cures any defect.

Upon a filing of bankruptcy, title to the bankrupt's property vests in the trustee in bankruptcy. "Property" includes the right to pursue causes of action formerly belonging to the debtor. *Hanover Insurance Co. v. Tyco Industries, Inc.*, 500 F.2d 654, 656 (3d Cir.1974). Bryson thus was not a proper plaintiff when this

---

8. It is also arguable that even by this standard the Bank's statement fails. The label "payment date" gives no hint of who should pay what by that date and what the effect of non-payment will be. *See* FTC Informal Staff Opinion (August 18, 1969), Consumer Credit Guide (CCH) ¶ 30,292, 1969–1974 Special Releases-Correspondence Transfer Binder.

9. Again, the contrary is arguable. The label does nothing to explain that it is payment of this balance which avoids the finance charge. Further, the required "minimum payment" is located closer to the payment date than the total balance, thus risking the confusion warned against by letters Nos. 436 and 538.

suit was instituted. However, a trustee may abandon his claim to any asset which he deems to be less valuable than the cost of recovering it. *Id.* at 657; 11 U.S.C. § 554(a). This is exactly the statement plaintiff's trustee makes in the submitted affidavit. An effective abandonment would relate back to the time of filing of the petition, thereby retroactively making plaintiff a proper party. *Brown v. O'Keefe*, 300 U.S. 598, 602, 57 S.Ct. 543, 546, 81 L.Ed. 827 (1937).

█ Abandonment, however, is not effectuated by an affidavit from the trustee. The Bankruptcy Code, specifically 11 U.S.C. § 554, authorizes a trustee to abandon any property of the estate "[a]fter notice and a hearing." Implementing this, Fed.R. Bankruptcy 608 provides for approval by the Bankruptcy Court of such abandonment. The Advisory Committee Note to Rule 608 states that the rule "codifies the preferred practice developed under case law." See, *e.g., Lincoln Nat. Life Ins. Co. v. Seales*, 62 F.2d 582, 585 (5th Cir.1933). According to *Collier on Bankruptcy*, which is cited by the Advisory Committee as authority for the case law practice, the preferred practice is to require court approval as a "condition prerequisite" to abandonment by the trustee. 4 *Colliers on Bankruptcy*, ¶ 554.01 (15th Ed. 1982). Rule 608 and § 554 must therefore be read to require court approval before a trustee can abandon property otherwise within the estate.[10] This rule assures that the creditors of the bankrupt, for whom the trustee must conserve the estate, are given an opportunity to object to the returning of any property to the bankrupt. In the absence of court approval of trustee abandonment of plaintiff Bryson's claims, they must be dismissed in their entirety.

### VI.

█ Plaintiff Berkowitz has individually asserted a number of claims under the Act in connection with an application for a home improvement loan which was never approved by the Bank. According to affidavits submitted by Bank officials, the loan was denied for lack of adequate collateral, although the issue of the reason for the denial is in dispute.[11] The Bank claims that because no loan was consummated, Berkowitz cannot assert Truth-in-Lending Act claims in connection with it.

Both sides agree that "consummation" of a transaction is required before a consum-

---

**10.** Section 554, of course, specifies other conditions for finding abandonment, but there is no evidence to indicate that these conditions exist.

**11.** Defendant's loan officer swears that the Bank's approval was conditioned upon receipt of an appraisal of plaintiff's home. When the appraisal showed that the home was worth far less than plaintiff estimated on his application, so little that plaintiff's equity was less than the amount of the requested loan, the loan application was summarily denied. Although Berkowitz and his wife completed the loan documents, the blank space on the note which is ordinarily filled with the date when repayment is to begin was never completed. According to the Bank, this indicates that no approval was ever granted.

Plaintiff's story is somewhat different. He claims to have received a telephone call from the Bank sometime after having completed his application. The caller told him to go to the Bank to sign the loan documents, and from the call he claims to have "understood" that his application had been approved. At a meeting at the Bank on July 29, 1980, he was given loan documents to take home for his wife's signature.

He claims to have discussed the low appraisal with Gerald Welshoff, a loan officer. They also discussed his purchase of credit life insurance in connection with the loan. From the character of the officer's discussion plaintiff appears to have concluded that the loan was approved. He claims that the loan was only later denied because he had discovered that the Bank maintained a covert policy of requiring credit life insurance despite the statement on their loan forms that they did not require it, and caused his loan agreement to reflect that undisclosed policy.

There are inconsistencies in the evidence submitted by defendant. For example, although the affidavit of Gerald Welshoff declares that the Bank received the home appraisal after his July 29 meeting with plaintiff Berkowitz, the memorandum describing the appraisal is dated July 28. The affidavit does not explain why the Bank asked the Berkowitzs to sign the loan documents if it already possessed the information which caused it to deny the loan. Indeed, the chronology supports plaintiff's claim that the Bank approved the loan despite the low appraisal and only later retracted its approval.

er's right of action attaches under the Truth-in-Lending Act. This is the general consensus among courts which have considered the question. *See Nash v. First Financial Savings & Loan Association,* 703 F.2d 233, 238 (7th Cir.1983) and cases cited therein. However, it is not entirely clear what "consummation" means. The conclusion that consummation is required is not derived from an explicit statutory directive. Instead, it results from numerous references in the Act to "person[s] to whom consumer credit *is extended,*" 15 U.S.C. § 1631(a) (1980), and to "creditors ... *extending* credit," 12 C.F.R. § 226.8(a) (1980) (emphasis added). *See Harman v. New Hampshire Savings Bank,* 638 F.2d 280, 282 (1st Cir.1981). While recognizing that the question is not free from doubt, courts have concluded that this language requires an extension of credit before a violation occurs. *Id.* at 283. This requirement, however, must be read in the context of the purposes of the Act, one of which is to facilitate comparison shopping by consumers of credit. 15 U.S.C. § 1601(a). For this reason, liability under the Act has been found despite the failure of the parties to consummate a mutually binding contract. *Madewell v. Marietta Dodge, Inc.,* 506 F.Supp. 286 (N.D.Ga.1980); *Copley v. Rona Enterprises, Inc.,* 423 F.Supp. 979 (S.D.Ohio 1976).

Defendant claims that "consummation" occurs only when a legally binding contract is created between both parties. I cannot agree. While this is a tenable interpretation of both "consummation" and the language of the statute, consideration of the aims of the Act requires a different result. As noted, the Act was designed to facilitate informed shopping for credit as well as informed purchase of credit. 15 U.S.C.

§ 1601(a). Toward that end, it requires disclosure before, as well as when, credit is extended. Accordingly, the time of attachment of a right of action under the Act should be fixed with a view toward protecting the interests of those shopping for credit as well as those actually purchasing credit. Imposing the requirement that a binding contract be created on both sides before a right of action attaches would needlessly limit the plaintiff class while inhibiting enforcement of the former purpose. A more appropriate time of attachment is that point at which the consumer, on the basis of the information his "comparison shopping" has generated, makes a choice and commits himself or herself to the purchase of credit, without regard for the degree of commitment of the lender.[12] This marks the end of the consumer's shopping. It is at this time that the consumer becomes vulnerable to actual damage from the lender's inadequate or deceptive disclosures, for at this time he or she can be contractually bound to the terms of the lending contract at the option of the lender. The rule insures that all plaintiffs are seriously-intentioned consumers of credit, for it requires them to incur some risk in return for a right of action under the Act.[13] At the same time, it prevents the lender from binding his potential debtors with inadequate disclosure and then selecting as customers those whom he thinks are least likely to pursue their rights under the Act. Instead, it impresses upon the lender the importance of full compliance with the Act before the customer is committed. This interpretation is fully consistent with Judge Shoob's decision in *Madewell, supra,* in which he held that parties who had obligated themselves to purchase an automobile on credit could sue under the Act even

---

12. If the parties simultaneously bind themselves, the two rules will have indistinguishable effects. However, credit purchasers frequently sign loan forms which may then be approved or disapproved by the lender. In this case, the right attaches when the form is signed, not when the loan is approved.

13. Congress sought to vest enforcement of the Act in the hands of "private attorney generals,"

*Bizier v. Globe Financial Services, Inc.,* 654 F.2d 1, 2 (1st Cir.1981). In doing so, it set no express limits on the right of individual members of the public to bring suit. In order to prevent harassment suits and insure the requisite actual injury necessary to gain federal standing, *see,* e.g., *Warth v. Seldin,* 422 U.S. 490, 498–500, 95 S.Ct. 2197, 2204–2205, 45 L.Ed.2d 343 (1975), some limits are desirable.

though the lender failed to approve their loan. 506 F.Supp. at 288. *See also Copley v. Rona Enterprises, Inc., supra.* Nor is it necessarily inconsistent with *Gary v. W.T. Grant,* Consumer Credit Guide (CCH) ¶ 98,550, 1974–1980 Decisions Transfer Binder (N.D.Ga., Aug. 25, 1975), which held that where bank approval was necessary to consummate a loan no right attaches before approval. In that case the plaintiffs did not agree to purchase credit. Therefore, the instant question, whether consumer agreement to purchase credit invokes the protection of the Act, never arose.

■ I look to the plaintiff's version of the events in applying the rule. According to plaintiff's affidavit, the day before he submitted his application he was told that he would not be given the loan because he refused to accept credit life insurance. Plaintiff responded that in that case he would accept the insurance, but he wrote on the bottom of the application that his acceptance was under protest.

It is reasonable to conclude from this exchange that at the time he submitted his loan application plaintiff had been given no final word as to the status of his loan. It is true that before the forms were submitted the loan officer reportedly told plaintiff that he could not have the loan, but that denial seems to have been expressly conditioned on plaintiff's refusal to buy credit life insurance. (Berkowitz Affidavit, ¶ 11). As a result of the implicit condition plaintiff accepted the insurance, albeit under protest. There is no indication that such an action would automatically have resulted in denial of the loan. Therefore, since it appears that plaintiff's application was submitted in the good faith belief that he was being considered for the loan, his application falls squarely within the rule announced above. The motion to dismiss this claim is denied.

■ Mr. Berkowitz asserts a further claim in connection with this loan. As alluded to above, Mr. Berkowitz asserts that

before he submitted the loan forms he was told that his purchase of credit life insurance was a required precondition to the Bank's granting of the loan. The loan documents, in contrast, clearly state that such insurance is not required. Mr. Berkowitz claims to have been confused by this and to have told the Bank officer that he would accept the insurance only if required to do so. He claims that it was at this point—following his attempts to ascertain the truth of the Bank's disclosures—that the Bank decided not to approve his loan.

The Truth-in-Lending Act does not dictate creditor policy regarding acceptance of credit life insurance. Creditors are free to require it or to offer it as an option. However, if insurance is required the Act requires the creditor to include the charge for it—in this case nearly one thousand dollars—in the statement of the finance charge. 15 U.S.C. § 1605(b). If the insurance is not a factor in the approval of the loan by the creditor, the premium need not be included in the finance charge, but the creditor must clearly disclose that the purchase of insurance is not a factor. 15 U.S.C. § 1605(b)(1). On the loan documents, the Bank clearly stated that acceptance of the insurance was not required. While it stated the premium charge near the finance charge, it did not include the premium in the finance charge. If the Bank did not, in fact, require the insurance, it was in compliance with the Act.

Plaintiff, however, claims that the Bank maintained a covert policy of requiring the insurance. He claims that his attempts to ascertain the accuracy of the Bank's disclosure, and thereby to enforce his rights under the Act, caused the Bank to deny him credit. This states a claim under § 701 of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, which forbids a creditor from discriminating against consumers because of, *inter alia,* the consumer's good faith exercise of their rights under the Truth-in-Lending Act. 15 U.S.C.

§ 1691(a)(3).[14] This claim will not be dismissed.[15]

### VII.

■ It appears that defendant's request for a more definite statement under Fed.R.Civ.P. 12(e) has been partially mooted by the submissions in opposition to this motion. However, plaintiffs' Third Count is so vague as to give no notice as to the claims against the Bank, and I require plaintiffs to submit a statement detailing the facts on which that Count is based. However, plaintiffs are not required to submit a statement detailing exactly what sections or subsections of the Equal Credit Opportunity Act, Regulation B, and New York state law these acts allegedly violated. A Rule 12(e) motion should not be used simply to ascertain a plaintiff's legal theories. *Hylte Bruks Aktiebolag v. Babcock & Wilcox Co.*, 45 F.R.D. 357, 360 (S.D.N.Y. 1968). The statement must be submitted to the Court within thirty days of the date of this Order.

Defendant is directed to answer those of plaintiffs' interrogatories which are relevant to the remaining questions in this lawsuit: whether the Bank maintained a policy of requiring insurance on loans such as the one at issue, in contradiction to the clear disclosure, and whether Mr. Berkowitz's inquiries as to this fact led to the denial of his loan application. An order governing the further conduct of pretrial proceedings is to be entered concurrently with this opinion.

### CONCLUSION

Defendant's motion to dismiss Counts Three and Four, which concern violations of the Truth-in-Lending Act and the Equal Credit Opportunity Act in connection with the home improvement loan to plaintiff Berkowitz, is denied. Defendant's motions to dismiss Counts One and Four, which concerned violations of state and federal truth-in-lending laws in connection with the Visa charge accounts, are denied with respect to the claims of plaintiffs Berkowitz and Eizik but granted as to those of plaintiff Bryson. All claims of Donald Bryson are therefore dismissed.

Although plaintiffs Berkowitz and Eizik have not moved for summary judgment, the undisputed facts demonstrate that they are entitled to a grant of summary judgment *sua sponte* on their claims under Count One regarding the Visa charge accounts.

It is SO ORDERED.

**14.** Defendant has submitted policy statements and affidavits which attest that Bank policy is in conformance that stated on their loan documents and which deny all of plaintiff's assertions. While it may well be true that the Bank adheres to its stated policies, plaintiff's affidavit credibly sets this fact at issue. The forms may comply with the Act, but that is not determinative of the issue if in fact the Bank pursued a different policy. The issue does not lend itself to summary judgment.

**15.** This opinion does not address the plaintiffs' state law claims. Although the statute clearly specifies that compliance with federal law is compliance with state law, N.Y.Gen.Bus.Law § 349(d), the state law implications of today's rulings are not so clear. I offer no opinion as to the validity of the claims or even as to their proper presence here under pendent jurisdiction.

APPENDIX A

# EMPIRE NATIONAL BANK
## BILLING STATEMENT
(VISA - CASH ADVANCE CHECKS - CHECKMATE)

NOTICE: SEE REVERSE SIDE AND ACCOMPANYING STATEMENT(S) FOR IMPORTANT INFORMATION.

### MINIMUM PAYMENT DUE

| PAST DUE | MINIMUM CURRENT DUE | TOTAL MINIMUM DUE |
|---|---|---|
| 5200 | 5200 | 10400 |

| BILLING DATE | PAYMENT DATE | ACCOUNT NUMBER | CREDIT LINE |
|---|---|---|---|
| 09 22 80 | 10 17 80 | 170 795 | 1500 |

ITEM(S) IN DISPUTE ARE NOT REQUIRED TO BE PAID DURING THE ERROR RESOLUTION PERIOD.

| | PURCHASES | ADVANCES |
|---|---|---|
| PREVIOUS BALANCE | 17585 | 129513 |
| PAYMENTS | | |
| TOTAL CREDIT ADJ. | | |
| TOTAL DEBIT ADJ. | | |
| TOTAL NEW CHARGES | | 1295 |
| FINANCE CHARGE | 36+ | 130808 |
| NEW BALANCE | 17940 | |
| ITEMS | TOTAL NEW BALANCE AT BILLING DATE 148657 | |

| | PURCHASES | ADVANCES |
|---|---|---|
| AVERAGE DAILY BALANCE SUBJECT TO FINANCE CHARGES | 17535 | 129513 |

ANNUAL PERCENTAGE RATES FOR FINANCE CHARGE IS 18% (A PERIODIC RATE OF 1½% PER MONTH) ON THE AVERAGE DAILY PURCHASE BALANCE OF $500 OR LESS; AND 12% (A PERIODIC RATE OF 1% PER MONTH) ON ANY EXCESS THEREOF OVER $500 AND ON THE AVERAGE DAILY ADVANCE BALANCE.

ATTENTION — YOUR ACCOUNT IS PAST DUE $52.00
REMIT IMMEDIATELY.

BA-33 (REV 5/80)