[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 25, 2004
THOMAS K. KAHN
CLERK

No. 03-11384

_____

D.C. Docket No. 02-00609-CV-8-6-30 EAJ

RANDAL S. BRAGG, ROBERT I. CRABTREE, et al.,

Plaintiffs-Appellants,

versus

BILL HEARD CHEVROLET, INC. - PLANT CITY,
WFS FINANCIAL, INC., et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 25, 2004)**

Before BLACK, BARKETT and STAHL*, Circuit Judges.

STAHL, Circuit Judge:

---

*Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

The issue before us is whether the district court correctly determined that plaintiff-appellant Randal Bragg failed to state a claim under the Truth in Lending Act, 15 U.S.C. § 1601, et seq. ("TILA") against defendant-appellee Bill Heard Chevrolet Inc.-Plant City ("Bill Heard"). We hold that Bragg's complaint does state a claim under TILA, and reverse the decision below.

## I. BACKGROUND

We take the following recitation of facts from Bragg's amended complaint. See La Grasta v. First Union Securities, Inc., 358 F.3d 840, 845 (11th Cir. 2004); Omar v. Lindsey, 334 F.3d 1246, 1247 (11th. Cir. 2003). Bill Heard is licensed in Florida as a motor vehicle dealer and a motor vehicle retail installment seller. On September 28, 2001, Bragg visited Bill Heard and decided to purchase a new 2002 Chevrolet Silverado truck. As a down payment, Bragg paid six hundred dollars in cash and traded in his 1994 Ford Escort, which Bill Heard valued at five hundred dollars.

On that day, Bragg signed one Standard Purchase Contract ("Purchase Contract #1") and two standard Florida Simple Interest Vehicle Retail Installment Contracts ("RISC #1" and "RISC #2"). Bill Heard did not sign these documents. Purchase Contract #1 listed the selling price of the truck as $19,253.34, plus a Silencer Alarm ("SAP") for $399.00 and Vehicle Theft Registration ("VTR") for

2

$199.00.[1]  RISC #1 listed an annual percentage rate ("APR") of 14.65 percent, a

finance charge of $10,947.33, and amount financed of $21,158.91.  RISC #2 listed

an APR of 14.50 percent, a finance charge of $10,642.05, and amount financed of

$21,158.91.  Both RISCs included insurance and debt cancellation coverage

("GAP Protection") for a charge of $495.00.[2]  Bill Heard is listed as the "Creditor-

Seller" in the RISCs.

Bragg also signed a Bailment Agreement for Vehicle Spot Delivery

("Bailment Agreement").  This permitted Bragg to take possession of the new

vehicle immediately.  The Bailment Agreement explicitly incorporated the terms

of the Purchase Contract.

On October 1, 2001, Bill Heard contacted Bragg and requested that he sign

additional documents.  This time Bragg signed two new Purchase Contracts

("Purchase Contract #2" and "Purchase Contract #3") and two new RISCs ("RISC

#3" and "RISC #4").  Purchase Contract #2 listed a selling price of $18,993.00,

plus an Extended Service Contract price of $990.00, while Purchase Contract #3

---

[1]VTR is an anti-theft etching identification program that provides insurance benefits to customers in the event that their cars are stolen.  SAP is an alarm installed on the vehicle that also provides insurance benefits.

[2]GAP protection is coverage offered to a customer in the event that the vehicle is determined by the relevant insurance company to be a total loss as a result of theft or physical damage.  It covers the shortfall between the applicable insurance coverage and any amount still owed.

listed a selling price of $18,993.00.  Neither of these two Purchase Contracts contained charges for VTR and SAP.  RISC #3 listed an APR of 14.89 percent, a finance charge of $11,699.11, and an amount financed of $22,176.18, while RISC #4 listed an APR of 14.89 percent, a finance charge of $11,102.69, and an amount financed of $21,046.09.  All four of these contracts were backdated by Bill Heard to the date of Bragg's first visit, September 28, 2001.  None of the contracts were executed by Bill Heard.

On October 5, Bill Heard assigned RISC #4 to Triad Financial Corporation, and Triad issued payment to Bill Heard for $19,982.24.  This RISC was the only one signed by Bill Heard.

Central to Bragg's claims is Bill Heard's "spot delivery" procedure.  Here, we stress again that at this stage, we must accept as true the well-plead factual allegations in Bragg's complaint, as well as all inferences from those allegations in the light most favorable to Bragg.  La Grasta, 358 F.3d at 845; Omar, 334 F.3d at 1247.  Under "spot delivery," the customer is presented with a Purchase Agreement, RISC, and Bailment Agreement.  Bill Heard then delivers the car to the customer "on the spot" on the same date that the customer signs the documents, and allows him or her to take the car without the passage of title.  The customer in return typically makes a cash deposit or trades in an existing vehicle

4

as a down payment. Bragg contends that customers like him are "under the impression they have purchased a car under certain sales and finance terms." On occasion, Bill Heard will notify a customer that it was not able to secure the financing rates agreed to in the documents and ask them to sign new agreements with less favorable financing terms. If a new RISC is executed, the financing terms are calculated from the date of actual delivery of the vehicle to the customer. According to Bragg, Bill Heard never executes the original RISCs. Instead, it uses the initial lower financing rates to entice the customers under a "bait and switch" scheme. Bragg also asserts that Bill Heard requires forfeiture of the down payment or trade-in vehicle if the customer refuses to accept the new financing terms.[3]

On November 30, 2001, Bragg filed a class action suit against Bill Heard in state court on behalf of himself and several other similarly situated customers. The complaint set forth five counts: (1) violations of Florida's Deceptive and Unfair Trade Practices Act, Fl. Stat. §§ 501.201, et seq.; (2) unjust enrichment; (3) violations of TILA and Regulation Z; (4) violations of Florida's Motor Vehicle

---

[3]According to Bill Heard, if financing is not obtained, the consumer has no obligation to purchase the vehicle and instead must pay Bill Heard twenty cents for each mile driven during the bailment agreement. In that case, it contends, a deposit or trade-in car would be returned to the customer. If financing is obtained, the buyer receives title to the vehicle purchased and is not responsible for any rental fees.

Retail Sales Finance Act, Fl. Stat. §§ 520.01, et seq.; and (5) declaratory and injunctive relief. Bragg's TILA claim asserted that Bill Heard (1) failed to make required TILA disclosures prior to the buyer's consummation of credit terms; (2) failed to include in the finance charge the costs of credit insurance products sold in connection with the credit transaction, when it had failed to make the required disclosures as a precondition to excluding those charges from the finance charge; (3) failed to accurately disclose credit terms; (4) failed to state clearly that the APRs in the first two RISCs were "estimates"; and (5) failed to disclose any amounts it paid to third persons on Bragg's behalf.

Bill Heard removed the case to federal district court and on April 16, 2002, it moved to dismiss all of Bragg's claims pursuant to Fed. R. Civ. P. 12(b)(6). On September 1, 2002, the district court granted in part and denied in part Bill Heard's motion to dismiss and granted Bragg leave to file an amended complaint. We need not set forth each of the district court's dispositions in this first order.

On September 25, 2002, Bragg filed an amended complaint. In turn, Bill Heard moved to dismiss the TILA claim, arguing that Bragg never consummated a transaction with it in which a TILA violation occurred. On January 24, 2003, the district court dismissed the TILA claim with prejudice and declined to exercise supplemental jurisdiction over Bragg's remaining state law claims. It concluded

6

that Bragg never consummated either of the first two RISCs because the relevant agreements contained an unsatisfied condition precedent: specifically, neither party was "bound" until Bill Heard sold either of the RISCs to another lender.

On January 29, 2003, Bragg filed a motion for rehearing. On February 14, in a published opinion, the district court again held that the first two RISCs were never consummated and hence no TILA violated occurred. Bragg v. Bill Heard Chevrolet, Inc., 245 F.Supp.2d 1235 (M.D. Fla. 2003). The court also rejected Bragg's renewed argument that Bill Heard failed to clearly state that the APRs in the first two RISCs were "estimates" and thus in violation of TILA. Id. at 1238-39.

This appeal followed.[4]

---

[4]On February 7, Bragg filed a motion seeking approval to exceed the twenty-page limit for a motion for rehearing of the January 24 order dismissing Bragg's claims (which was docketed on January 27) and a February 3, 2003 order striking another class member's (John Cone) motion to intervene in the lawsuit (which was docketed on February 5). Attached to the motion was his proposed twenty-five page Fed. R. Civ. P. 59(e) motion for rehearing of the two orders, which the district court did not separately docket on that date but instead forwarded to chambers. On February 11, the court granted the motion for extension of the page limit and the clerk docketed the Rule 59(e) motion on the same day. On February 18, the district court denied Bragg's 59(e) motion. Bragg then moved for clarification as to whether the court, in its January 27 and February 18 orders, intended to remand his state law claims back to state court. On February 27, the court granted the motion for clarification and directed the clerk to remand the case to state court. On March 13, Bragg filed a notice of appeal to challenge the January 27 dismissal and the February 5 denial of Cone's motion to intervene.

To be timely, a notice of appeal in a civil case must be filed no later than thirty days after entry of the challenged order or judgment. Fed. R. App. P. 4(a)(1)(A). A motion to alter or amend a judgment, pursuant to Fed. R. Civ. P. 59(e), filed within ten business days of the entry of the challenged decision tolls the appeal period until the entry of the order resolving the last such motion.

7

## II. DISCUSSION

### A.   Applicable law

We review a district court's dismissal for failure to state a claim <u>de novo</u>. <u>Behlen v. Merrill Lynch</u>, 311 F.3d 1087, 1090 (11th Cir. 2002).  In dismissing a complaint, the facts alleged therein must be taken as true and the district court must determine "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Marshall County Bd. of Educ. v. Marshall County Gas Dist.</u>, 992 F.2d 1171, 1174 (11th Cir. 1993).  Contract interpretation is a question

---

Fed. R. App. P. 4(a)(4).  The order resolving Bragg's Rule 59(e) motion was entered on February 18; hence, if the motion tolled the appeal period, the notice of appeal challenging the January 27 dismissal order was due on March 20.

We hold that Bragg's notice of appeal was timely.  The Rule 59(e) motion, filed on February 7, was timely under Fed. R. App. P. 4(a)(4) to toll the appeal period prescribed by Fed. R. App. 4(a)(1)(A).  Though the clerk did not docket the Rule 59(e) motion until February 11, Bragg physically filed the motion on February 7, the ninth business day following the entry of the January 27 dismissal order.  Several circuits have determined that pleadings should be deemed filed on the date submitted to the clerk.  See <u>Wight v. Bankamerica Corp.</u>, 219 F.3d 79, 83 (2d Cir. 2000); <u>Werth v. Makita Electric Works, Ltd.</u>, 950 F.2d 643, 646-47 (10th Cir. 1991); <u>Sierra On-Line, Inc. v. Phoenix Software, Inc.</u>, 739 F.2d 1415, 1419-20 (9th Cir. 1984).  Fed. R. Civ. P. 5(e) provides that "filing of papers with the court as required by these rules shall be made by filing them with the clerk of the court . . . .  The clerk shall not refuse to accept for filing any paper presented for that purpose solely because it is not presented in proper form as required by these rules or any local rules of practices."  The clerk did not technically refuse Bragg's noncompliant 59(e) motion for filing. In fact, the motion bears the clerk's stamp that it was filed on February 7.  In any event, it is apparent that here the district court excused any noncompliance with its local page limit rule and deemed the motion timely filed.  Moreover, there is no evidence that Bragg exhibited a lack of diligence in filing his motion.  In previous cases, we have been concerned that a motion to extend the appeal period may not be construed as a notice of appeal when it evinces uncertainty as to whether the party will in fact appeal.  See e.g., <u>Harris v. Ballard</u>, 158 F.3d 1164, 1166 (11th Cir. 1998).  That concern is absent here.

of law that we review de novo. Southland Distrib. Mktg. Co., Inc. v. S & P Co., 296 F.3d 1050, 1053 (11th Cir. 2002) (citing Gymco Constr. Co., Inc. v. Architectural Glass and Windows, Inc., 884 F.2d 1362, 1364 (11th Cir. 1989)).

TILA's declaration of purpose states, in relevant part:

> The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms . . . would be strengthened by the informed use of consumer credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601(a). As a remedial statute, TILA must be construed liberally in favor of the consumer. Ellis v. Gen. Motors Acceptance Corp., 160 F.3d 703, 707 (11th Cir. 1998); Cody v. Cmty. Loan Corp. of Richmond County, 606 F.2d 499, 505 (5th Cir. 1979).[5]

When a creditor sells credit property insurance in connection with a credit transaction, TILA requires the creditor to make certain disclosures to buyers before they become obligated on a RISC in which the creditor has excluded the charge for such insurance from the finance charge and included it in the amount

---

[5]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 12, 1981.

financed. 15 U.S.C. § 1605(c). In this case, Bragg alleged that VTR, SAP and GAP constituted credit property insurance that was included in the amount financed and hence triggered the TILA requirements.

The specific content and timing of the disclosures are set forth in Regulation Z, which was adopted by the Federal Reserve Board in support of TILA. 15 U.S.C. § 1638(a); 12 C.F.R. §§ 226.2(a)(13) and 226.18; see also Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 568 (1980) (courts must defer to the regulations of the Federal Reserve Board when interpreting TILA). Regulation Z requires that the creditor disclose the identity of the creditor, the amount being financed, the annual percentage rate, the total sale price, and the total amount of payment. 15 U.S.C. § 1638(a); 12 C.F.R. § 226.18. These disclosures must be made "before credit is extended," a point known as "consummation." "'Consummation means the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). We evaluate TILA transactions from the consumer's viewpoint. Cody, 606 F.2d at 505.

Regulation Z also provides that, when determining the point at which a consumer becomes contractually obligated to a credit agreement, state law should govern. 12 C.F.R. § 226, Official Staff Commentary 2(a)(13). However, "although state law is determinative of when a contractual relationship is created,

10

it has nothing whatsoever to do with how the transaction is to be characterized for [TILA] purposes"; that question is governed by federal law. Cody, 606 F.2d at 505. Under Florida law, the interpretation of contracts is a question of law if the contractual language is clear and unambiguous. Press v. Jordan, 670 So. 2d 1016, 1017 (Fla.App. 3 Dist. 1996).

B.    Consummation theory of TILA liability

Bragg contends that the district court erred in holding that no pertinent credit agreement was consummated. He maintains that in this case, consummation occurred not when title to the automobile passed or when a bilateral contract was formed, but rather when he signed the RISCs, thereby becoming obligated on the credit agreement.

We agree that well-reasoned case law supports this interpretation. Recently, the Fourth Circuit held that TILA can encompass unfunded financing agreements. Nigh v. Koons Buick Pontiac GMC, Inc., 319 F.3d 119, 123 (4th Cir. 2003), cert. granted, Koons Buick Pontiac GMC, Inc. v. Nigh, 124 S.Ct. 1144 (2004).[6] Seeking to buy a car and trade in his existing vehicle, Nigh signed a Buyer's Order reflecting the proposed purchase and a RISC setting forth the proposed financing. Id. at 122. As in Bragg's case, the dealer did not countersign either document;

---

[6]The certiorari petition does not concern the consummation issue.

11

rather, it intended to sign only when a lender agreed to buy an assignment of the installment payments owed under the RISC. Id. "The transaction's closing and the completion of Nigh's purchase were thus left within the dealership's unilateral control." Id.

Applying Regulation Z, the Nigh court joined others holding that consummation can encompass unfunded financing agreements. See, e.g., Cannon v. Metro Ford, Inc., 242 F.Supp.2d 1322, 1330 (S.D.Fla. 2002); Johnson v. Steven Sims Subaru, Inc., 1993 WL 761231 (N.D. Ill.1993); Bryson v. Bank of New York, 584 F.Supp. 1306 (S.D.N.Y.1984); Madewell v. Marietta Dodge, Inc., 506 F.Supp. 286 (N.D. Ga.1980); Copley v. Rona Enterprises, Inc., 423 F.Supp. 979 (S.D. Ohio 1976); see also Clark v. Troy and Nichols, Inc., 864 F.2d 1261, 1265 (5th Cir. 1989) (Thornberry, J., dissenting). We agree that this holding is consistent with Regulation Z's exclusive reference to the consumer's commitment. See Nigh, 319 F.3d at 124. It is also in keeping with TILA's overarching purpose of consumer protection. See id.

> [T]he point at which the consumer . . . commits himself or herself to the purchase of credit, without regard for the degree of commitment of the lender . . . [is the point at which] the consumer becomes vulnerable to actual damage from the lender's inadequate or deceptive disclosures, for at this time he or she can be contractually bound to the terms of the lending contract at the option of the lender.

12

Bryson, 584 F.Supp. at 1317.

The district court held, however, that Bragg's obligations under the first and second RISCs never arose because they were contingent on Bill Heard's obtaining financing. It pointed out that the Purchase Contracts signed by Bragg set forth a condition precedent of financing approval. Bragg, 245 F.Supp.2d at 1238 n.4. The Purchase Contracts provided that the Seller agrees to sell the designated vehicle "provided however, the designated financial institution approves Purchaser's request for a loan . . ." The Purchase Contracts additionally stated, "Neither party hereto shall be bound to the other until terms of credit have been approved by both parties . . ." Moreover, the Bailment Agreement incorporated the terms of the Purchase Contracts and stated that it was "pending credit approval of buyer(s) by lending institution and completion of sales transaction."

Under Florida law, parties can condition formation of a contract on the occurrence of an event. See, e.g., Huskamp Motor Co. v. Hebden, 104 So. 2d 96, 98 (Fla.App. 3 Dist. 1958); 777 Flagler Co. v. Amerifirst Bank, 559 So. 2d 1210, 1211 (Fla.App. 4 Dist. 1990). There was no condition precedent set forth in the RISCs themselves. The district court held that under Florida contract law, however, the condition of financing approval contained in the Purchase Contracts and Bailment Agreement nonetheless was applicable. "Under Florida law, where

two or more documents are executed by the same parties, at or near the same time and concerning the same transaction or subject matter, the documents are generally construed together as a single contract." Clayton v. Howard Johnson Franchise Systems, Inc., 954 F.2d 645, 648 (11th Cir. 1992); Quix Snaxx, Inc. v. Sorensen, 710 So.2d 152, 153 (Fla. 3d DCA 1998).

Bragg contends that the relevant Purchase Contracts and Bailment Agreement should not be considered along with the RISCs because they were not "executed" within the meaning of the applicable Florida case law, as they were never signed by Bill Heard. He also maintains that those agreements were ambiguous, requiring construction against the drafter, Bill Heard, and precluding its modification of the RISCs. Moreover, Bragg contends that the Bailment Agreement is void and unenforceable under Florida law because it was not first signed by Bill Heard, and because it contravenes public policy. See Fla. Stat. §§ 520.07(1)(a) and 520.07(7).

As an initial matter, it is far from clear whether the rule of contract law articulated in Quix Snaxx would apply to these documents. The RISCs provided simply, "[b]y signing this contract, you choose to buy the vehicle under the agreements on the front and back of this contract"; they did not refer explicitly to the Purchase Contract or any other document containing a condition precedent.

14

See Quix Snaxx, 710 So.2d 153 ("Where a writing expressly refers to and sufficiently describes another document, the other document . . . is to be interpreted as part of the writing."). Nor did the Purchase Contracts or Bailment Agreements reference the RISCs. See id. Moreover, the RISCs contained a modification clause: "This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it." Furthermore, as noted supra, Bill Heard did not sign the Purchase Contracts or Bailment Agreement, leaving them technically unexecuted. We could find no cases extending the Quix Snaxx rule to the circumstances alleged here.

We need not resolve this legal question, however. In any event, even assuming the RISCs contained a condition precedent, the district court was incorrect in finding that consummation occurred only upon assignment of the loan. Under the district court's interpretation of Florida law and Regulation Z, a creditor could provide necessary TILA disclosures after the consumer signed a conditional financing agreement as long as the disclosures were made sometime before the loan was assigned. Disclosures that come after the consumer executes a RISC, however, are likely to be of little or no value to that consumer.

Therefore, we reject the district court's reading of Regulation Z as contrary to the central goal of TILA, which is to provide "meaningful disclosure of credit

15

terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U.S.C. § 1601(a). As this court has explained, "[w]hile it is true that the language of a statute should be interpreted according to its ordinary, contemporary and common meaning, this plain-meaning rule should not be applied to produce a result which is actually inconsistent with the policies underlying the statute." Bailey v. USC Corp., 850 F.2d 1506, 1509 (11th Cir. 1988) (emphasis added) (internal citation omitted). Given the strong remedial purpose of TILA and continual admonitions that we construe TILA and Regulation Z liberally in the consumer's favor, see, e.g. Cody, 606 F.2d at 505, we cannot accept the district court's interpretation of Regulation Z, as it would undermine the ability of prospective consumers of credit to weigh competing offers.

Regardless of "the degree of commitment of the lender" contained in the agreements' condition precedent, Bryson, 584 F.Supp. at 1317, Bragg's signature on these documents rendered him contractually obligated to the purchase of credit and thus constituted consummation for purposes of TILA disclosures. To give full effect to TILA's goal of providing meaningful and timely disclosure of important credit terms, we hold that in a financing agreement containing a condition precedent where the condition of obtaining financing is within the exclusive

control of the seller and third-party lender, consummation occurs when the consumer signs the contract.

C.     "Estimates theory" of TILA liability

Bragg offers another theory of Bill Heard's liability under TILA: that it violated the statute by failing to label its credit terms in the first two RISCs as estimates and to compute the APR accordingly.  In addition, he contends that Bill Heard violated TILA by disclosing an inaccurate APR in RISC #4, specifically by backdating the RISC #4 to September 28, 2001, and by computing the APR and charging interest from that date.  In his reply brief, Bragg makes clear that these arguments are intended to be alternative positions to be pursued only if this court affirms the dismissal below.  As we reverse, we need not address this theory.

### III. CONCLUSION

For the reasons set forth supra, we REVERSE the district court's dismissal of Bragg's TILA claim and REMAND for further proceedings consistent with this opinion.