Lourdes **MURO**, Plaintiff,

v.

**HERMANOS AUTO WHOLESALERS, INC.,** Defendant.

**No. 06–22311–CIV–SEITZ/MCALILEY.**

United States District Court, S.D. Florida.

Sept. 20, 2007.

Robert W. Murphy of Fort Lauderdale, for Plaintiff.

Aaron R. Sobel of North Miami Beach, for Defendant.

### ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PATRICIA A. SEITZ, District Judge.

THIS MATTER is before the Court on Plaintiff's Motion for Partial Summary Judgment [DE–18]. Plaintiff Lourdes Muro ("Plaintiff") moves for judgment in her favor and against Defendant Hermanos Auto Wholesalers, Inc. ("Defendant") on Count I for violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1640 *et seq.* and Count II for violation of Article IX of Florida's version of the Uniform Commercial Code ("UCC"), § 679.601 Fla. Stat. *et seq.*[1]

Plaintiff's Complaint arises from the purchase, and subsequent repossession, of a used car from Defendant, a used car dealership. Plaintiff contends that Defendant violated the TILA by failing to make certain mandatory credit disclosures at the time Plaintiff committed to finance the car. Plaintiff also claims Defendant violated the TILA though a "bait and switch" tactic of changing the terms of the credit agreement adversely to her after she had placed a down payment on the car and taken possession of it. In addition, Plaintiff argues that Defendant's subsequent repossession and resale of the car contravenes Article IX of Florida's UCC. Based on the undisputed record, and a review of the pertinent legal authorities and the parties'

submissions, Plaintiff's motion is granted as to both Counts I and II.

### I. Factual Background

The following facts are undisputed unless otherwise indicated. On September 15, 2005, Plaintiff and Defendant executed an agreement ("Agreement"), described by the parties as both a "buyers order" (DE–27, Sanchez Dep. p. 18) and a "Purchase and Finance Agreement" (DE–1, Complaint ¶ 10) for the purchase of a used 2002 Jaguar automobile. The Agreement states in pertinent part:

> Purchaser (Buyer) agrees that this order includes all of the terms and conditions herefore. That this order cancels and supercedes any prior agreements written or verbal. Purchaser agrees to pay the total of payments in accordance with the payment schedule shown above. This order shall not become binding until accepted by the dealer or his or her authorized representative.

(DE–1, Ex. 6). The schedule of payments referred to provides the following:

| | |
|---|---|
| APR: | 17.950% |
| FINANCE CHARGE: | 8,227.38 |
| TOT[AL] PAYMENTS: | 23,989.20 |

(*Id.*). The Agreement also states that "[t]he balance is to be paid in 60.00 payments of $399.82 dollars. First payment is due on 10/15/2005 and monthly." (*Id.*). At the bottom of the form, below the signature line, are the words "Lien to: CPS." (*Id.*). As mentioned, both parties signed the Agreement. Plaintiff, but not Defendant, also signed another buyers order identical to the one signed September 15, 2005,[2] (Sanchez Dep. Ex. 3).

---

1. Plaintiff's three-count Complaint also alleges a cause of action for violation of Florida's Deceptive and Unfair Trade Practices Act, § 501.201, Fla. Stat. *et seq.* Count III is not presently before the Court.

2. For reasons that are not entirely clear, Plaintiff signed at least three buyers orders.

The first, signed by Plaintiff on September 15, 2005 (but not signed by Defendant) did not include a $2,794 extended warranty included in the final transaction. (Sanchez Dep. Ex. 2). The second, signed by both parties on September 15, 2005, includes the warranty. (*Id.*, Ex. 6). Finally, a third buyers order virtually identical to the second one was

.Two days later on September 17, 2005, Plaintiff signed two Retail Installment Sales Contracts ("RISC") (DE–27, Sanchez Dep. Ex. 1, Ex. 8), for the purchase of the same used car.[3] The RISC lists Plaintiff as the "Buyer" of the car and Defendant as the "Creditor–Seller." (*Id.*, Ex. 1, 8). The RISC states that "[b]y signing this contract, you [the Buyer] choose to buy the vehicle on credit under the agreements on the front and back of this contract. You·agree to pay the Creditor–Seller ... the Amount Financed and Finance Charge according to the payment schedule below." (*Id.*). The RISC includes a section containing the following "Federal Truth–In–Lending Disclosures" which mirror the disclosures in the Agreement but which provide fuller details:

ANNUAL PERCENTAGE RATE: 17.95%
FINANCE CHARGE: $8,227.37
AMOUNT FINANCED: $15,761.83
TOTAL OF PAYMENTS: $23,989.20
TOTAL SALE PRICE, including
your down payment of $5,042 is: $29,031.20
(*Id.*).

The RISC states that Plaintiff will pay 60 monthly installment payments of $399.82 (beginning October 17, 2005). (*Id.*). The RISC also contains a section entitled "NO COOLING OFF PERIOD" which states in bold that "State law does not provide for a 'cooling off' or cancellation period after this·sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind." (*Id.*) In addition, the RISC contains a merger clause which provides that "[t]his contract contains the entire agreement between you [Plaintiff] and

---

signed by Plaintiff, but not Defendant, on September 17, 2005.

**3.** The RISC's are identical except for the itemization of the amount financed. All of the pertinent TILA disclosures are the same. Defendant signed one of the RISCs (Ex. 8) but not the other (Ex. 1).

us [Defendant] relating to this contract. Any change to this contract must be made in writing and we must sign it. No oral changes are binding." (*Id.*).

Pursuant to the terms of the Agreement, and as provided in the RISC, Plaintiff paid Defendant the negotiated $5,042 down payment and took possession of the car. Defendant then contacted a lender, Consumer Portfolio Services ("CPS"), and attempted, unsuccessfully, to assign the contract on the financing terms set forth in the Agreement and the RISC. According to Defendant's version of events, CPS refused to accept the contract when Plaintiff complained to CPS about the mechanical condition of the car on several occasions. (Sanchez Dep. p. 30). Defendant then began searching for alternative finance arrangements with other lenders but none were available on as favorable terms as those set forth in the Agreement and the RISC. It appears that the best financing Defendant could arrange resulted in payments of $427 per month, as opposed to $399.[4] (Sanchez Dep. Ex. 4, p. 2). Plaintiff rejected any new financing arrangements (Sanchez Dep. p. 42) and tried to make the monthly installment payment of $399 set forth in the Agreement and the RISC, which the Defendant refused to accept. (*Id.*, p. 43).

While the exact dates are not clear, according to Defendant, Plaintiff retained possession of the vehicle for approximately three months until Defendant repossessed it. After the repossession, on January 3, 2006, Defendant sent Plaintiff a notice letter advising her:

---

**4.** Although Mr. Sanchez, Defendant's president, did not have the exact figures during his deposition (Sanchez Dep. p. 41), and no other direct evidence of the new terms appears in the record, Mr. Sanchez's notes indicate, and there is no dispute, that the terms were not as favorable as those in the original RISC. (*Id.*, p. 42 and Ex. 4, p. 2)

As you are aware we have taken possession of the above described vehicle for failure to pay remaining balance as agreed. . We ask that you come in so that we may help you obtain financing for the balance you owe us in accordance with the buyer's order you signed on September 15, 2005. . . . We are giving you a total of 10 working days from receipt of this notice to contact us at [phone number] so we may know what your decision is. Failure to contact us will give us the indication that you do not want the vehicle and you are forfeiting the amount of down payment given to [Defendant].

(Sanchez Dep. Ex. 7).

Plaintiff did not contact Defendant within the 10 days, although Defendant claims that the parties communicated on several occasions in an effort to resolve the dispute. Ultimately, the Defendant sold the car to someone else. Plaintiff then sued Defendant claiming that the financing terms set forth in the Agreement and the RISC were incomplete and/or inaccurate, in violation of the TILA.

In its defense, Defendant argues that the TILA does not apply to the transaction because it is not a creditor within the meaning of the statute. Characterizing the transaction in question as merely a loan of the car pending financing approvals, Defendant also claims that the TILA does not apply because the Agreement and RISC were simply part of a conditional finance agreement that did not guarantee any financing terms, and, therefore, the financing transaction was never consummated (as required by the TILA) because no credit was ever extended. Therefore, Defendant argues that the UCC likewise does not apply to the repossession.

## II. Summary Judgment Standard

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the initial burden is met, the non-moving party must go beyond the pleadings and "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). To survive summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that a jury could reasonably find for that party. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. In assessing whether the parties have met their respective burdens, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor. *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir.2001).

## III. Analysis

### A. Truth–In–Lending Act Claims

■ The TILA was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms

available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601 (Congressional findings); *Fairley v. Turan–Foley Imports, Inc.,* 65 F.3d 475, 479 (5th Cir. 1995) ("purpose of TILA is to protect the consumer from inaccurate and unfair credit practices"). To that end, the statute and its implementing regulations set forth the timing and content of certain mandatory disclosures regarding finance charges, annual percentage rates of interest, total payment schedule and the like. *See* 15 U.S.C. §§ 1331–32, 1368; 12 C.F.R. Part 226 ("Regulation Z"); *see also generally Bragg v. Bill Heard Chevrolet, Inc.,* 374 F.3d 1060 (11th Cir.2004). The TILA must be construed liberally in favor of the consumer because it is a remedial statute. *See Bragg,* 374 F.3d at 1065 (citations omitted).

Defendant does not dispute that the terms it disclosed to Plaintiff in the Agreement were incomplete for TILA purposes. For example, the Agreement does not set forth either the "amount financed" or the "total sale price," as mandated by 15 U.S.C. § 1368(a)(2)(A), (7) and 12 C.F.R. § 226.18(b), (j), or the descriptive explanation of the financing terms as required by 15 U.S.C. § 1368(a)(8). Instead, Defendant attempts to avoid any of the TILA disclosure requirements by arguing that it is not a creditor and that no credit agreement was consummated. These positions do not withstand scrutiny.

### (1) Defendant is a "creditor" within the meaning of the TILA

■ Defendant contends that it is not a creditor because the Agreement notes (in small print at the bottom of the page after the signature block) the words "Lien to: CPS." This argument does not get far, however, because the Agreement, which is Defendant's form, states that it becomes binding and payment is due from Plaintiff once Defendant or Defendant's agent signs it. Any layperson reading the Agreement would reasonably assume that because the Agreement becomes binding upon Defendant's signature, and Defendant in fact signed it, that Defendant was extending the credit described therein. The fine print "Lien to: CPS" on the bottom of the form gives no clear indication that CPS is the creditor. In fact, at the time the Agreement was signed, Defendant had not even contacted CPS. It would be contrary to the purpose of the TILA to make CPS responsible as creditor for disclosures on a credit transaction it had no knowledge of and had not consented to.

This reasonable assumption is buttressed by the disclosures Defendant later made in the RISC. The RISC conspicuously states in bold letters at the top of the document that Defendant is the "Creditor–Seller." (DE–26, Ex. 1, 8). It makes no difference that Defendant *intended* to later assign the contract to CPS; it is enough under the TILA that Defendant is the person to whom the debt is initially payable. *See* 15 U.S.C. § 1602(f). In holding itself out in the RISC as the "Creditor–Seller" to whom Plaintiff was bound "to pay" ... "the Amount Financed and the Finance Charge" (DE–26, Ex., 8), Defendant is "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(f). Moreover, the purpose of the TILA would be frustrated if Defendant could bind Plaintiff to certain financing terms, as the Agreement and RISC undeniably do, but then not be accountable for the completeness or accuracy of those terms.

In addition to the express language of the Agreement and the RISC, and the text and purpose of the TILA, finding Defendant to be a creditor with disclosure obligations to Plaintiff is consistent with the Official Commentary to Regulation Z,

which provides that auto dealers who arrange for financing with a bank through the use of credit installment contracts are creditors under the TILA. *See* 12 C.F.R. § 226 Suppl. I, ¶ 2(a)17(I).[5] At least one appellate court has expressly found a used car dealer to be a TILA creditor, over similar objections as those Defendant raises. *See Riviere v. Banner Chevrolet, Inc.,* 184 F.3d 457, 461 (5th Cir.1999). Moreover, without expressly addressing the creditor question raised here, numerous courts, including the Eleventh Circuit, have applied the TILA's disclosure obligations to used car dealers like Defendant, implicitly finding them to be TILA creditors. *See, e.g., Bragg v. Bill Heard Chevrolet, Inc.,* 374 F.3d 1060 (11th Cir.2004); *Ellis v. GMAC,* 160 F.3d 703 (11th Cir. 1998).

### (2) Plaintiff consummated a credit agreement

■ Defendant's second argument is that the TILA disclosure obligations did not arise in this case because the Agreement was conditioned on the acceptance of the contract by a lender. Put differently, Defendant asserts that the parties' financing agreement was not yet consummated because CPS had not accepted assignment of the contract, and therefore the TILA's disclosure requirements were not triggered. This argument is contrary to the TILA regulations and has been soundly rejected by the courts. Under Regulation Z, creditors must "make [TILA] disclosures *before consummation of the transaction.*" 12 C.F.R. § 226.17(b) (emphasis added); *see also* 15 U.S.C. § 1638(b)(1) ("disclosures ... shall be made *before credit is extended.*") (emphasis added). Regulation Z defines consummation as the "time that a consumer becomes contractu-

ally obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). Thus, the courts have ruled that the TILA's disclosure requirements become effective at the point in the transaction at which the buyer signs a credit agreement and becomes obligated to pay on it, regardless of the level of the creditor's commitment. *See Bragg,* 374 F.3d at 1066. Quoting an earlier district court decision on the issue, the *Bragg* court explained:

> [T]he point at which the consumer ... commits himself or herself to the purchase of credit, without regard for the degree of commitment of the lender ... [is the point at which] the consumer becomes vulnerable to actual damage from the lender's inadequate or deceptive disclosures, for at this time he or she can be contractually bound to the terms of the lending contract at the option of the lender.

*Id.* (quoting *Bryson v. Bank of New York,* 584 F.Supp. 1306, 1317 (S.D.N.Y.1984)); *see also Nigh v. Koons Buick Pontiac GMC, Inc.,* 319 F.3d 119, 124 (4th Cir. 2003) ("we conclude that consummation, or extension of credit, under [the TILA], encompasses unfunded, financing agreement options to which consumers contractually commit, and under which they can be bound at the lender's sole discretion."), *rev'd on other grounds,* 543 U.S. 50, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004). Here, as in *Bragg,* Plaintiff became obligated to purchase the car on the stated financing terms upon signing the Agreement, regardless of whether Defendant signed the document or whether Defendant intended to assign the contract to a lender at some later date. Only at that point could complete and accurate disclosures effectuate the informed use of credit.

---

**5.** In *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565–66, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980), the Supreme Court stated that,

"[u]nless demonstrably irrational, Federal Reserve Board staff opinions construing [TILA or Regulation Z] should be dispositive."

Defendant's characterization of the credit transaction as "conditional" has little support in the record in any event. Other than the cryptic "Lien to: CPS" at the bottom of the Agreement, nothing suggests that the credit terms are conditional on a third-party lender approving the financing terms. In fact, the operative language in the Agreement supports a contrary reading. It says that Plaintiff "agrees to pay the total of payments" on the stated terms once it is accepted by Defendant. Defendant accepted the Agreement by signing it. Furthermore, after Defendant repossessed the vehicle, Defendant attempted to hold Plaintiff to her obligations in the Agreement to pay the full price of the car, ignoring the credit terms altogether. It would be manifestly inequitable to allow Defendant to avoid its TILA disclosure obligations on the ground that there was no financing agreement, yet allow it to use that very same document to bind Plaintiff to a sale on different, undisclosed terms.

### (3) The TILA applies to the credit transaction

■ Having disposed of Defendant's meritless efforts to avoid the TILA, the unchallenged conclusion is that Defendant did not comply with its TILA obligations when it failed to make certain mandatory disclosures in the Agreement, namely failing to disclose the amount financed and the total sale price, among other things. In the alternative, Defendant's failure to honor the disclosed finance percentage rate of 17.95% (along with other payment terms based on that rate) at the time Plaintiff committed to the credit transaction, along with its attempt to force her to

accept a higher rate or lose her down payment, also violates the TILA. *See Bragg,* 374 F.3d at 1063 (describing similar practices in reversing district court's dismissal of TILA claim).[6] It bears emphasizing that this decision does not prevent car dealers like Defendant from conditioning car sales on the later acceptance of a potential buyer's credit. If Defendant wants to engage in such a conditional credit agreement in the future, however, it must, as it could have here, clearly indicate that fact in the credit agreement documents.

### B. TILA Damages

Plaintiff seeks actual damages in an amount equal to the down payment Defendant retained, statutory damages in an amount of $1000, as well as reasonable attorney fees and costs, as relief for the Defendant's TILA violations. The TILA provides, in pertinent part that

> [A]ny creditor who fails to comply with any requirement imposed under this part ... with respect to any person is liable to such person in an amount equal to the sum of—
>
> (1) any actual damage sustained by such person as a result of the failure;
>
> (2)(A) (i) in the case of an individual action twice the amount of any finance charge in connection with the transaction ... except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000 ....; [and]
>
> (3) in the case of any successful action to enforce the foregoing liability ... the costs of the action, together with a rea-

---

6. At least one circuit has expressed reluctance to accept such a position. *See Janikowski v. Lynch Ford, Inc.,* 210 F.3d 765 (7th Cir.2000). *Janikowski* is distinguishable from this case, however, because there plaintiff *agreed* to accept the higher rate, and defendant accurately

and completely disclosed the new rate. *See Patton v. Jeff Wyler Eastgate, Inc.,* No. 06–cv–010, 2007 WL 756709 (S.D.Ohio, Mar. 8, 2007) (distinguishing *Jankowski* and finding inaccurate "bait and switch" disclosures to violate the TILA).

sonable attorney's fee as determined by the court. . . .

15 U.S.C. § 1640(a); *see also Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004) (discussing application of $1000 statutory cap). Here, the finance charge in question was $8,227.37, so the TILA caps Plaintiff's statutory damages at the maximum of $1000. *See Koons,* 543 U.S. at 59, 125 S.Ct. 460 (holding that the "$1,000 ceiling appl[ies] to recoveries under § 1640(a)(2)(A)(i)").

As for the return of Plaintiff's down payment, Defendant argues that Plaintiff has not shown that this injury is causally related to Defendant's TILA violations, as required for recovery of actual damages. *See Turner v. Beneficial Corp.,* 242 F.3d 1023, 1024–25 (11th Cir.2001) (no actual damages absent a showing of detrimental reliance). Since Plaintiff signed the Agreement and RISC, she presumably read the disclosures and relied upon them in entering the credit transaction and paying the down payment. The fact that she attempted to comply with her side of the bargain by paying the monthly payment of $399, and the fact that she would not agree to accept a different, higher interest rate suggests that she did rely on the disclosures. It seems highly unlikely, therefore, that the incomplete and inaccurate financing disclosures, and especially the failure to honor the 17.95% rate initially disclosed, did not cause her to lose her down payment within the meaning of the TILA. However, it is also true that Plaintiff has submitted no evidence to establish causation. For example, there is no deposition testimony or affidavit establishing that Plaintiff read the disclosures and relied on them in making her down payment. It is possible that, as in *Turner,* Plaintiff did not read and therefore did not rely on them, or that she would have made the down payment even on different, higher credit terms. While these scenarios are doubtful, without some evidence in the rec-

ord to rule them out, summary judgment cannot be granted as to the down payment at this time

### C. UCC Claims

In Count II, Plaintiff argues that Defendant's disposition of the vehicle after its repossession violates Article IX of Florida's version of the UCC, § 679.601 Fla. Stat. *et seq.* Although Plaintiff cites to various sections of the Florida code, and generally claims that the resale was not commercially reasonable, the only clearly articulated violation is that Defendant did not comply with the notice provisions of § 679.614 prior to disposition of the car.

Section 679.614 provides that prior to disposition of a repossessed consumer good, the secured party must provide the debtor with the following:

(a) The information specified in § 679.613(1) [described below];

(b) A description of any liability for a deficiency of the person to whom the notification is sent;

(c) A telephone number from which the amount that must be paid to the secured party to redeem the collateral under § 679.623 is available; and

(d) A telephone number or mailing address from which additional information concerning the disposition and the obligation secured is available.

Fla. Stat. § 679.614(1). The information specified in § 679.613(1), which is incorporated into § 679.614(1), mandates that the notice:

(a) Describe the debtor and the secured party;

(b) Describe the collateral that is the subject of the intended disposition;

(c) State the method of intended disposition;

(d) State that the debtor is entitled to an accounting of the unpaid indebted-

ness and state the charge, if any, for an accounting; and

(e) State the time and place of a public disposition or the time after which any other disposition is to be made.

■ According to the UCC commentary to § 679.614, "[a] notification that lacks any of the information set forth in paragraph (1) is insufficient as a matter of law." Here, Plaintiff argues that Defendant's notice fails to meet the standard because it does not contain the information required in subsections (c)-(e). A review of the notice confirms Plaintiff's position, and Defendant does not argue otherwise. Rather, as with the TILA claim, Defendant attempts to avoid its notice obligations under the UCC by asserting that it was not a creditor repossessing on a default, but an owner taking back a car Plaintiff borrowed pending financing approval. This argument is flawed. First, the Agreement both parties signed speaks in terms of an automobile purchase, not a loan contingent on financing. Second, as described in the preceding section (*supra* pp. 8–9), the Agreement and RISC cannot be viewed as conditional. And third, after the repossession, Defendant treated the transaction as a sale when it told Plaintiff that she was obligated to pay the remaining balance or lose her down payment.[7] Because the transaction was clearly a consumer-goods transaction,[8] the notice provision of § 769.614 applies. Since Defendant's notification lacks some of the required elements of that section,

it fails as a matter of law and Plaintiff is entitled to statutory damages.

### D. Damages Under § 679.614

Proof of a violation of § 679.614 entitles Plaintiff to recover damages in accordance with § 679.625(3)(b), which provides in pertinent part that "[i]f the collateral is consumer goods, a person who was a debtor ... at the time a secured party failed to comply with this part may recover for that failure in any event an amount not less than the credit service charge plus 10 percent of the principal amount of the obligation...." The Agreement and the RISC state that Plaintiff financed $15,761.83, and that Plaintiff's total finance charge equals $8,227.37. Accordingly, Plaintiff's statutory damages under § 679.625(3)(b) were $9,803.55.[9] *See In re Schwalb*, 347 B.R. 726, 755 (Bankr.D.Nev.2006) (applying identical provision of Nevada code); *Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23, 32 (Tenn.App.1991) (applying identical provision of Tennessee code).

### IV. Conclusion

For the foregoing reasons, Plaintiff has established that Defendant violated the TILA's mandatory disclosure requirements and also violated the notice provisions of Florida's UCC, Article IX. Accordingly, it is hereby

ORDERED that

(1) Plaintiff's Motion for Partial Summary Judgment [DE–18] is GRANTED as to Counts I and II;

---

7. In a letter sent to Plaintiff on October 13, 2005, Defendant also stated that "[w]e are only concerned with obtaining the remaining balance in accordance with the [Agreement.]" (Sanchez Dep. Ex. 5) "We are your loss payee and lien holder ...."(*Id.*).

8. A consumer goods transaction means "a consumer transaction in which: (1) an indi-

vidual incurs an obligation primarily for personal, family, or household purposes; and (2) a security interest in consumer goods secures the obligation." § 679.614(x) Fla. Stat.

9. $8,227.37 (credit service charge) + $1,576.18 (10% of 15,761.83) = $9,803.55.

(2) Plaintiff is entitled to judgment in her favor for $1000 in statutory damages on Count I, plus reasonable attorney fees and costs, and $9,803.55 in statutory damages on Count II, and the Court shall enter partial judgment in Plaintiff's favor for $10,803.55;

(3) With regard to the $5,042 down payment, given the narrow issue of causation remaining to be litigated, the parties are required to meet and confer in a good faith effort to resolve this remaining dispute without the need for trial or further judicial intervention if the evidence of causation shows that Plaintiff is entitled to relief; the parties shall jointly file notice of their position by **September 28, 2007;** and

(4) In light of the relief granted herein and the available remedies under the FDUTPA, *see* § 501.211, Fla. Stat., Plaintiff shall file by September 28, 2007, after conferring in good faith with Defendant, a notice regarding whether she intends to proceed to trial with her FDUTPA claim, along with a detailed calculation of the damages that she believes she is entitled to if she prevails on that claim.