RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0079p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                              *Plaintiff-Appellee,*

                    *v.*                                                        No. 08-3062

PATRICIA PETROFF-KLINE,
                              *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 06-02103—Solomon Oliver, Jr., District Judge.

Argued: January 23, 2009

Decided and Filed: March 3, 2009

Before: GIBBONS and McKEAGUE, Circuit Judges; SHADUR, Senior District Judge.[*]

_____

## COUNSEL

**ARGUED:** D. James Petroff, FAULKNER, MUSKOVITZ & PHILLIPS, Cleveland, Ohio, for Appellant. Lori White Laisure, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** D. James Petroff, FAULKNER, MUSKOVITZ & PHILLIPS, Cleveland, Ohio, for Appellant. Lori White Laisure, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

SHADUR, Senior District Judge. Patricia Petroff-Kline ("Petroff-Kline") appeals the district court's grant of summary judgment to the United States and its corresponding denial of Petroff-Kline's cross-motion for summary judgment. Acting on

_____

[*]The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

behalf of the Department of Health and Human Services ("HHS"), the Government brought the action against Petroff-Kline to collect the amount of Health Education Assistance Loan ("Health Education Loan") indebtedness that Petroff-Kline had incurred while she was a student at Tufts University's School of Dentistry ("Tufts"). After considering the parties' cross-motions for summary judgment and supplemental briefing as to the amount of Petroff-Kline's indebtedness, the district court granted the Government's motion for summary judgment in the amount of $208,349.20 plus interest accrued from August 15, 2007. We affirm.

## I.

Patterned after the United States' Guaranteed Student Loan ("Student Loan") program, the Health Education Loan program was enacted to meet the needs of health profession students who had to borrow substantially more than the borrowing limit under the Student Loan program. Health Education Loans were made available to full-time students in certain health profession schools. Administered by the Public Health Services of HHS, the Health Education Loan program employs a three-party structure: (1) private lenders make the loans, (2) the schools administer their application and disbursement and (3) HHS guarantees the loans. Lenders often sell their Health Education Loans to the Student Loan Marketing Association ("Sallie Mae"), a secondary loan market established by statute.

After the borrower's graduation or departure from school, the lender establishes a repayment schedule that begins the first day of the tenth month after the borrower ceases to be a full-time student at a Health Education Loan school and allows the borrower up to 33 years to repay the loan. After the repayment period begins the borrower may request a forbearance, which provides an extension of time for making loan payments to avoid the borrower's default on his or her payments.

In the event of the borrower's default, death, total and permanent disability or bankruptcy, HHS will pay off the lender's loss in principal and interest if the lender has complied with the terms of the Health Education Loan insurance contract, the statute and the regulations. HHS is then assigned the borrower's notes.

While Petroff-Kline was a student at Tufts, she applied for and obtained six Health Education Loans, and Tufts approved all the requests. Petroff-Kline signed promissory notes for the Health Education Loans, and Bay Bank Norfolk Trust Company ("Bay Bank") approved Petroff-Kline for all six loans: (1) $13,060 on September 12, 1986, (2) $6,940 on December 4, 1986, (3) $14,675 on August 15, 1987, (4) $18,730 on August 8, 1988, (5) $1,261 on January 5, 1989 and (6) $6,355 on October 13, 1989.

Sallie Mae later purchased Petroff-Kline's Health Education Loans from Bay Bank. Following five periods of forbearance from April 1, 1991 to May 6, 1993, Sallie Mae provided Petroff-Kline with repayment schedules on or about June 9, 1993 and notified her that payments were to begin on July 6, 1993. Petroff-Kline filed for Chapter 7 bankruptcy on July 31, 1995, and on September 9, 1995 she filed an adversary proceeding to seek an undue hardship discharge of the Health Assistance Loans. Although she was discharged from bankruptcy on October 3, 1997, her Health Education Loan debt was not discharged.

As a result of the adversary proceeding, Sallie Mae filed an insurance claim with HHS on September 19, 1995. About a week later HHS paid the claim in the amount of $105,495 and received an assignment of Petroff-Kline's promissory notes. On September 29, 1995 HHS sent Petroff-Kline a letter telling her that the promissory notes for her Health Education Loans had been assigned to the Government.

HHS informed Petroff-Kline about March 3, 1998 that her Health Education Loan debt had been referred to Payco American Corporation for collection and that her account would be referred to the United States Department of Justice ("DOJ") if she failed to either remit payment in full or enter into a repayment agreement. Petroff-Kline did not comply.

Then HHS wrote Petroff-Kline a March 26, 1998 letter stating that it intended to refer her Health Education Loan debt to other federal agencies for the purpose of administrative offset under the Debt Collection Improvement Act of 1996. Petroff-Kline was advised that a written response and repayment agreement or payment in full within

60 days from the date of the letter would terminate administrative offset action. Again Petroff-Kline did not respond.

Six years passed without full compliance by Petroff-Kline (as indicated later, she made some payments on account during that period). Then in an April 6, 2004 letter HHS notified her that she had 60 days to resolve her delinquent debt. She was further advised that if she was unwilling to establish a repayment agreement, her case would be referred immediately to the Office of the Inspector General for exclusion from participation in the Medicare and Medicaid programs. HHS also told Petroff-Kline that her debt would be transferred to the DOJ for enforced collection if she did not enter into a repayment agreement. Once more Petroff-Kline did not respond.

HHS thereafter warned Petroff-Kline repeatedly -- in letters dated July 23, 2004, April 18, 2005, September 12, 2005 and January 26, 2006 -- that if she did not enter into a repayment agreement her debt would be referred to the DOJ. Petroff-Kline still remained unresponsive. HHS finally referred Petroff-Kline's Health Education Loan debt to the DOJ for enforced collection on May 26, 2006.

Petroff-Kline had made payments totaling $9,764.11 to Sallie Mae on her Health Education Loans from September 20, 1990 to April 14, 1995. Sallie Mae refunded $66.96 to Petroff-Kline's account on April 5, 1996. Although not pursuant to any repayment agreement, Petroff-Kline also made 71 payments totaling $22,450 on the loans from October 20, 1998 to November 15, 2006. Thus the total amount paid on account by Petroff-Kline over the years came to $32,281.07. According to the Government, as of August 15, 2007 Petroff-Kline's outstanding debt on her Health Education Loans totaled $208,349.20.

On August 31, 2006 the Government filed an action in the Northern District of Ohio on behalf of HHS to recover the asserted amount of Petroff-Kline's Health Education Loan indebtedness. As stated earlier, both the Government and Petroff-Kline then filed motions for summary judgment. On October 17, 2007 the district court granted the Government's motion as to the existence of Petroff-Kline's indebtedness but denied summary judgment to the Government as to the amount of that indebtedness.

Just a few weeks later -- on November 5, 2007 -- the district court held a telephonic conference during which it vacated its partial order denying summary judgment as to the amount of indebtedness and allowed Petroff-Kline to file a supplemental motion on that issue.  After permitting the Government to file a response, the district court then reconsidered the Government's motion for summary judgment on the issue of the amount of indebtedness, and on November 14, 2007 it granted the Government's motion.  Petroff-Kline timely filed her notice of appeal from the district court's orders and judgment on December 12, 2007.

## II.

We review the district court's order granting summary judgment de novo (Sigler v. *American Honda Motor Co*., 532 F.3d 469, 482 (6th Cir. 2008)).  In reviewing a grant of summary judgment on cross-motions seeking such relief, we apply the same legal standards as the district court: whether, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to a  judgment as a matter of law  (*Relford v. Lexington-Fayette Urban County Gov't*, 390 F.3d 452, 456-57 (6th Cir. 2004)).

## III.

To recover on a promissory note the government must first make a prima facie showing that (1) the defendant signed it, (2) the government is the present owner or holder and (3) the note is in default (*United States v. MacDonald*, No. 93-1924, 1994 WL 194248, at *2 (6th Cir. May 16) (per curiam); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001)).  For that purpose the government may introduce evidence of the note and a sworn transcript of the account or certificate of indebtedness (*United States v. Davis*, 28 Fed. Appx. 502, 503 (6th Cir. 2002)).  Once such a prima facie case is established, defendant has the burden of proving the nonexistence, extinguishment or variance in payment of the obligation (*id.*).

First, Petroff-Kline argues that the Government cannot establish a prima facie case of indebtedness because it has not established that she signed the promissory notes

at issue.  Although she acknowledges that the Government gave her copies of the alleged notes, Petroff-Kline contends that she does not recognize the copies with her alleged signature on them.  According to Petroff-Kline, without presenting the original notes the Government has not produced any admissible evidence that Petroff-Kline signed the notes on which the Government seeks to recover.

At the outset, Petroff-Kline's argument is wholly disingenuous.  In its opinion denying Petroff-Kline's motion for hardship discharge in her 1997 bankruptcy proceedings, the bankruptcy court noted that Petroff-Kline testified "that she did review the loan documents before signing them and understood that the documents represented loans that she would have to repay" (*Kline v. Educ. Loan Serv. (In re Kline)*,  Case No. 95-1300, Adv. No. 95-5102, slip op. at 4 (Bankr. N.D. Ohio Mar. 28, 1997)).  In light of those admissions, Petroff-Kline's now-asserted amnesia regarding her Health Education Loan debt can scarcely be credited as establishing a *genuine* issue of material fact.

But even aside from that, Petroff-Kline's argument fails on its own merits.  *United States v. Williams*, No. 04-73603, 2005 WL 1343389 (E.D.Mich. May 26), the only case on which Petroff-Kline seeks to rely, is not at all comparable to this case (quite apart from the fact that, as a district court opinion, it is non-precedential).  In *Williams* the government sought to collect an alleged student loan debt from defendant based on promissory notes that defendant claimed he had never signed.  *Williams* found that a genuine issue of material fact existed as to whether the notes were in fact signed by defendant, so that the court denied the government's motion for summary judgment (*id.* at *2).  On that score the defendant there presented evidence that the social security number and middle initial of the "Kenneth Williams" on the alleged notes were different from his own (*id.*).  Considering that evidence in the light most favorable to defendant, *Williams* concluded that an ambiguity existed regarding the identity of the "Kenneth Williams" on the promissory note (*id.* at *3).

Nothing of the sort is presented here.  No evidence even suggests that Petroff-Kline is not the "Patricia Petroff" who signed the promissory notes introduced by the

Government.  Indeed, Petroff-Kline admits that she attended Tufts (as did the "Patricia Petroff" who signed the promissory notes).  All that she advances is an amorphous disclaimer that she does not recognize the notes containing that signature, insisting that the Government must therefore produce the original promissory notes.  But it is well established that "[p]hotocopies are allowed into evidence as if they were originals" (*Buziashvili v. Inman*, 106 F.3d 709, 717 (6th Cir. 1997), invoking Fed. R. Evid. ("Rule") 1003).  Thus the district court properly concluded that the Government established, as a matter of law, the first element of its prima facie case.

Next Petroff-Kline contests the third element of the Government's prima facie case, arguing that the declaration offered by the Government to establish the fact and amount of her indebtedness is unauthenticated and is inadmissible hearsay under Rule 803.  But an analysis of the applicable evidentiary rules confirms the bogus nature of that contention as well.

In support of its summary judgment motion the Government presented a declaration ("Declaration") by Barry Blum ("Blum"), the Chief of the Referral Control Section of the Debt Management Branch of HHS.  Petroff-Kline contends that because Blum lacks personal knowledge about the loan documents, default, amount of payments and calculation of interest -- all matters generated by Bay Bank and Sallie Mae -- that the Declaration does not qualify as a business record under Rule 803(6):

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

In that respect this case is parallel to *Lawrence*, 276 F.3d at 195, where the debtor also challenged the district court's grant of summary judgment to the United States in its action to enforce promissory notes. With its motion the United States had submitted copies of the notes, certificates of indebtedness, computerized loan records and an affidavit from a government loan analyst authenticating the loan records. Debtor Lawrence asserted (*id*. at 196) that "the certificates of indebtedness were not competent evidence because they were not based on personal knowledge and did not affirmatively show that the affiant was competent as required by rule 56(e)" and that the statements of Lawrence's indebtedness constituted "conclusory hearsay statements."

Those contentions were flatly rejected on the ground that any claimed defects in the certificates were cured by the affidavit of the loan analyst that "she is familiar with how the [Department of Education] maintains records related to students, that she was in custody and control of Lawrence's student loan records, that these records are kept in the course of DOE's regularly conducted student loan business" and that the promissory notes were true copies of the original documents (*id*.). *Lawrence*, *id*. at 196-97 concluded that the affidavit "satisfies the requirements of both rule 56(e) and the 'business records exception' to the hearsay rule," so that the district court had properly granted summary judgment to the United States on that basis.

Here too the Government filed the Declaration in addition to a certificate of Petroff-Kline's indebtedness. As the district court noted, the Declaration was similar to the affidavit that the *Lawrence* court found satisfied the requirements of Rule 803(6) and Fed.R.Civ.P. 56(e):

> Blum's Declaration sets forth that, "as Chief of the Referral Control Section ("RCS"), [he] is authorized to examine the records and claims of the HHS and to execute a Declaration of Facts based on these examinations; that "all documents attached hereto and referenced above are true and correct copies of official records maintained by HHS"; that "these files are kept in the ordinary course of HHS' regularly conducted activities and are made at or near the time by, or from, information transmitted by a person with knowledge"; and that HHS took assignment of the loans from Sallie Mae, and Sallie Mae took assignment of the loans from Bay Bank.

Indeed, to qualify under the business records exception to the hearsay rule a "witness need only have knowledge of the procedures under which the records were created," not knowledge of the actual entries in the records (*United States v. Wables*, 731 F.2d 440, 449 (7th Cir. 1984)).

Petroff-Kline also contends that the Declaration is inadmissible because it was not properly authenticated. But that is wholly at odds with the self-authentication provision of Rule 902(11), which the Declaration tracks directly. Hence the Declaration was clearly admissible and was properly considered by the district court as part of the Government's prima facie case.

In sum, the Government established each of the three elements essential to a prima facie case as to Petroff-Kline's indebtedness as a matter of law. We turn then to Petroff-Kline's effort to escape the vise of that indebtedness.

**IV.**

Petroff-Kline first argues that purported judicial admissions by the Government bar any recovery as a matter of law. On May 18, 2007 Petroff-Kline issued her initial discovery requests asking that the Government admit paragraphs in her amended answer that would have relieved her of liability for her alleged indebtedness. It was on June 20, 2007 that the Government filed its responses. Because that was 33 days after the requests were served -- three days beyond the 30 day timetable prescribed by Fed.R.Civ.P. 36(a)(3) -- Petroff-Kline maintains that the requested admissions must be deemed to have been admitted and that the district court erred by granting the Government leave to withdraw those admissions without any formal motion.

It must be said at the outset that Petroff-Kline has a skewed perception of Fed.R.Civ.P. 36, which is essentially intended to facilitate proof at trials by obviating the need to adduce testimony or documents as to matters that are really not in controversy. Thus Fed.R.Civ.P. 36(a)(1)(A) permits requests for admissions as to "facts, the application of law to fact, or opinions about either." As summarized in 7 *Moore's Federal Practice* § 36.10[8] at 36-26 (3d ed. 2008) (footnotes omitted):

>Requests for admission may relate to the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36.

To the same effect, see 8A Charles Wright, Arthur Miller and Richard Marcus, *Federal Practice and Procedure* § 2255, at 534 & n.8 (2d ed. 1994) and cases cited there, especially cases in the 2008 pocket part.

Yet, for example, Petroff-Kline sought to have the Government admit such statements as "Plaintiff has failed to state a claim upon which relief can be granted," "Plaintiff's claims are barred by the applicable statute of limitations and/or laches" and "Defendant does not owe money to Plaintiff." Plainly the first of those requests does not fit the prescribed mold, and the second is at least problematic in the same respect. Even the third, though it might perhaps be stretched into an effort to elicit a factual response, targets the ultimate legal issue in the case.

Thus there is a serious question as to whether Petroff-Kline could rely on the Government's purported admissions-by-silence even on her own terms. But we need not peg our rejection of Petroff-Kline's draconian argument on questions as to the proper scope of requests for admissions. Instead we look to the understandable discretion vested in district courts to permit a longer time for a written answer to a request for admissions and to accept "the filing of an answer that would otherwise be untimely" (*Gutting v. Falstaff Brewing Corp.*, 710 F.2d 1309, 1312 (8th Cir. 1983)). Hence "the failure to respond in a timely fashion does not require the court automatically to deem all matters admitted" (*id.*). That point of view is all of a piece with such judicial proclivities as the strong reluctance to default defendants for a few days' delay in filing their responsive pleadings.

Although Petroff-Kline urges that a formal motion was required to grant leave to withdraw the Government's admissions, we have held that a formal motion is not always required (*Kerry Steel Inc. v. Paragon Indus.*, 106 F.3d 147, 153-54 (6th Cir. 1997)). Instead a withdrawal "may be imputed from a party's actions," including the filing of a belated denial (*Chancellor v. City of Detroit*, 454 F.Supp.2d 645, 666

(E.D.Mich. 2006) (coincidentally involving denials that, like the Government's responses here, were just three days late)). Despite its failure to have filed a formal motion to withdraw its claimed admissions, the Government's filing of a slightly overdue response effectively served as such a withdrawal. Accordingly the purported admissions neither bar the Government's recovery nor require that Petroff-Kline be granted summary judgment on the Government's claims.

## V.

Lastly, Petroff-Kline argues that the loans at issue violated the Truth in Lending Act ("TILA," 15 U.S.C. §§ 1601 et seq.[1]) because they did not contain certain required disclosures and that she is entitled to assert those claims as a defense in this collection action for set-off or recoupment. That argument fails as well.

TILA requires that creditors make certain disclosures as to the terms of lending arrangements and provides for civil liability for failure to comply with its provisions (TILA § 1640). Pursuant to the authority delegated to it by TILA, the Federal Reserve System's Board of Governors have promulgated regulations, known collectively as Regulation Z (see 12 C.F.R. pt. 226[2], to implement its requirements). Although TILA exempts from its disclosure obligations student loan programs promulgated under the Higher Education Act of 1965 (Reg. § 226.3(f)), Petroff-Kline's Health Education Loans were authorized by a different statute -- the Public Health Service Act -- and therefore remain subject to TILA's requirements.

Reg. §§ 226.17 and 226.18 set forth TILA's disclosure requirements. Under Reg. § 226.18 a creditor must disclose applicable information about the loan transaction, including the amount financed, the finance charge, the annual percentage rate, the payment schedule, information regarding the variable rate, the total payments and total

---

[1] Citations to TILA provisions will take the form "TILA § --," using the Title 15 numbering but omitting the prefatory "15 U.S.C."

[2] Citations to Regulation Z will take the form "Reg. § --," omitting the prefatory "12 C.F.R."

sale price. But Reg. § 226.17(i) limits those required disclosures as to student loans of the type at issue here:

> For each transaction involving an interim credit extension under a student credit program, the creditor need not make the following disclosures: the finance charge under § 226.18(d), the payment schedule under § 226.18(g), the total of payments under § 226.18(h), or the total sale price under § 226.18(j).

Both the reasons for and more specifics as to those limitations are provided by the Official Staff Commentary ("Commentary") to that provision:

> 1. Definition. Student credit plans involve extensions of credit for education purposes where the repayment amount and schedule are not known at the time credit is advanced. These plans include loans made under any student credit plan, whether government or private, where the repayment period does not begin immediately. (Certain student credit plans that meet this definition are exempt from Regulation Z. See section 226.3(f).) Creditors in interim student credit extensions need not disclose the terms set forth in this paragraph at the time the credit is actually extended but must make complete disclosures at the time the creditor and consumer agree upon the repayment schedule for the total obligation. At that time, a new set of disclosures must be made of all applicable items under section 226.18.

> 2. Basis of disclosures. The disclosures given at the time of execution of the interim note should reflect two annual percentage rates, one for the interim period and one for the repayment period. The use of section 226.17(i) in making disclosures does not, by itself, make those disclosures estimates. Any portion of the finance charge, such as statutory interest, that is attributable to the interim period and is paid by the student (either as a prepaid finance charge, periodically during the interim period, in one payment at the end of the interim period, or capitalized at the beginning of the repayment period) must be reflected in the interim annual percentage rate. Interest subsidies, such as payments made by either a state or the federal government on an interim loan, must be excluded in computing the annual percentage rate on the interim obligation, when the consumer has no contingent liability for payment of those amounts. Any finance charges that are paid separately by the student at the outset or withheld from the proceeds of the loan are prepaid finance charges. An example of this type of charge is the loan guarantee fee. The sum of the prepaid finance charges is deducted from the loan proceeds to determine the amount financed and included in the calculation of the finance charge.

Petroff-Kline's Health Education Loans were clearly "extensions of credit for education purposes where the repayment amount and schedule are not known at the time credit is advanced," because the repayment schedule for Petroff-Kline's loans was

not entered into, and therefore could not be known, until after she completed her education. So the exemption for interim credit extensions expressly applied to her Health Education Loans.

Petroff-Kline nevertheless argues that even so, Regulation Z still requires the disclosure of two annual percentage rates -- one for the interim period and one for the repayment period -- and that she never received such disclosures when the loans were executed. True enough, although Reg. § 226.17(i) excludes the Health Education Loans from certain disclosures required by Reg. § 226.18, it does not excuse all of that section's disclosure requirements. Under both Reg. § 226.18(e) and the Commentary to Reg. § 226.17(i), the annual percentage rate of the loans and, if applicable, information regarding the variable rate of the loans still must be disclosed.[3] Petroff-Kline's contention must be analyzed in terms of those provisions.

To begin with, Petroff-Kline's first two promissory notes do contain two annual percentage rates, so her argument fails at the outset as to those notes. But the other four notes do not contain any annual percentage rate, and they (or at least the copies submitted by the Government) are too illegible to conclude that the proper disclosures regarding the variable interest rate were made. That, however, is not the whole story: On August 14, 1987, August 8, 1988, December 3, 1988, January 5, 1989, October 13, 1989 and December 19, 1989 Bay Bank did send Petroff-Kline disbursement and disclosure statements regarding her approved Health Education Loans. Those statements notified Petroff-Kline that her Health Education Loan application had been approved and that her loan check would be mailed to her educational institutional. They further stated that Petroff-Kline should make arrangements with the school to sign the check and advised Petroff-Kline that if she chose not to accept the loan, she should communicate with Bay Bank immediately.

---

[3]Reg. § 226.18(f)(1) requires that for variable rate loans where the annual percentage rate may increase after consummation of a transaction, the creditor must disclose the circumstances under which the rate may increase, any limitations on the increase, the effect of an increase, and an example of the payment terms that would result from an increase.

Also included in the disbursement disclosures were two annual percentage rate estimates for each disbursement (one applicable before, and the other applicable after, repayment began) and information about the variable rate calculation.**4** Those disclosures, however, were not made until the loan amounts were disbursed, obviously months later than when (1) Petroff-Kline had applied for her Health Education Loans and signed the promissory notes and (2) Bay Bank had approved the amounts of Petroff-Kline's Health Education Loans.

TILA liability arises when a creditor fails to make the required disclosures "before consummation of the transaction" (Reg. § 226.17(b)), defined as "the time that a consumer becomes contractually obligated on a credit transaction" (Reg. § 226.2(a)(13)). Thus "consummation" occurs when a borrower signs the loan documents and becomes obligated to pay, despite the fact that the loan may be contingent on the lender's approval (*Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1066 (11th Cir. 2004), followed in *Muro v. Hermanos Auto Wholesalers, Inc.*, 514 F.Supp.2d 1343, 1349 (S.D.Fla. 2007); *Copley v. Rona Enters., Inc.*, 423 F.Supp. 979, 982-83 (S.D.Ohio 1976)).

In this case, then, consummation occurred, so that the disclosure requirements became effective, when Petroff-Kline signed the promissory notes, even though the loans and their amounts were then subject to approval by Bay Bank. Because four of the notes did not contain the required disclosures at that time, they concededly violated TILA. But that violation does not help Petroff-Kline here, because the later disbursement notices did contain the information required by TILA, so that the violations were simply timing violations rather than substantive violations (TILA

---

**4**Each disbursement statement contained this information about the variable rate:

> The Annual Percentage Rate may increase during the term of this transaction if the index to the average of the bond equivalent rates for the ninety-one day U.S. Treasury Bills auctioned during the preceding quarter increases. The rate will not increase more than once every calendar quarter. Any increase will take the form of higher periodic payments, more payments of the same amount, or a larger amount due at maturity, depending upon the precise terms of repayment you agree to with the Lender.

§§ 1638(a) and (b)).  And because that distinction dictates the type of damages available for such violations, it turns out to be crucial here.

As a general rule an action under TILA must be brought "within one year from the date of the occurrence of the violation" (TILA § 1640(e)), but that does not bar a debtor from asserting a TILA violation as a defense to obtain recoupment in an action to collect the debt at issue (*id.*). Recoupment is measured by the amount of damages that would have been available for the original TILA violation (*In re Ramirez*, 329 B.R. 727, 732-33 (D. Kan. 2005); *In re Gillespie*, 110 B.R. 742, 748 (Bankr. E.D. Pa. 1990)).

TILA  § 1640(a) provides for two types of damage awards: statutory damages and actual damages.  But importantly, timing violations alone do not qualify for statutory damages (*Baker v. Sunny Chevrolet, Inc.,* 349 F.3d 862, 869 (6th Cir. 2003)). Instead a debtor must prove actual damages to recover for a timing violation (*id.*), and actual damages require a showing of  detrimental reliance (*In re Smith*, 289 F.3d 1155, 1157 (9th Cir. 2002) (per curiam), collecting cases, including our decision in *Stout v. J.D. Byrider*, 228 F.3d 709, 718 (6th Cir. 2000)).  To establish detrimental reliance, the debtor must demonstrate that he or she would either have received a better interest rate for the loans elsewhere or would have elected not to take the loan had the required information been available (*id.*).

Here Petroff-Kline has shown neither -- indeed, she has not even made an attempt in that regard.  Consequently she has not established that she is entitled to any actual damages, and she is thus unable to obtain recoupment from the Government in this action.

Indeed, the government has another string to its bow.  Even if Petroff-Kline had been able to establish actual damages from the TILA violation, she could not recoup that amount from the Government in any event.  Under TILA § 1612(b) the Government is immune from any civil or criminal penalties for violations of its provisions.  That immunity extends to attempted recoupments such as the one that Petroff-Kline seeks here (*FDIC v. Monterrey, Inc.*, 847 F.Supp. 997, 1004 (D. P.R. 1994); *FDIC v. Webb*, 464 F.Supp. 520, 525 (D.C. Tenn. 1978)).

For more than one reason, then, the timing violation of TILA as to four of Petroff-Kline's notes does not provide her with any viable defense. That leaves unimpaired the Government's ability to recover Petroff-Kline's outstanding Health Education Loan debt.

## VI.

After having taken advantage of a government-guaranteed loan program to finance her professional education, Petroff-Kline has engaged in extraordinarily protracted efforts -- and measures -- to evade repayment of her just indebtedness. But that ungrateful conduct has at last come to the end of the road. We affirm the district court's grant of summary judgment to the Government on both the fact and the amount of Petroff-Kline's Health Education Loan indebtedness.